ASSOCIATION CONCERNED ABOUT TOMORROW, INC. (ACT), et al., Plaintiffs

v.

Elizabeth DOLE, as Secretary of United States Department of Transportation, et al., Defendants.

Civ. A. No. 3–83–0585–H.

United States District Court
N.D. Texas,
Dallas Division.

June 4, 1985.

Walter A. Cober, Grand Prairie, Tex., for plaintiffs.

James A. Rolfe, U.S. Atty. by Claude Brown, Fort Worth, Tex., Mary Ann Moore, Asst. U.S. Attys., Dallas, Tex., James O. Price, Sp. Asst. U.S. Atty., Fort Worth, Tex., for Federal defendants.

David R. Thomas, Asst. Atty. Gen., State of Tex., Dallas, Tex., for State defendants.

## REVISED FINDINGS OF FACT AND CONCLUSIONS OF LAW

SANDERS, District Judge.

This is an action brought for declaratory and injunctive relief challenging the construction of a federally-funded primary highway route, designated State Highway 161, through Grand Prairie, Texas. Plaintiffs seek a declaratory judgment that Defendants have violated certain federal statutes in the planning and processing of the highway, and a preliminary and permanent injunction requiring Defendants to prepare a full, complete and adequate environmental impact statement (EIS) and § 4(f) statement, and to conduct additional public hearings before taking further steps toward completion of the highway.

This case was tried before the Court without a jury on March 11–15, 18, and 20, 1985. Based on the pleadings, the evidence adduced at trial, the stipulations, the argu-ments of counsel, the notes of the Court and the law clerk, the Court makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). Any findings which constitute conclusions or conclusions which constitute findings should be deemed the other, as appropriate.

### Findings of Fact

#### Parties

1. Plaintiff Association Concerned About Tomorrow, Inc. (ACT) is a voluntary association of Grand Prairie, Texas, homeowners formed to oppose the construction of State Highway 161.

2. The individual Plaintiffs have alleged specific concerns that the SH 161 project will harm their property and/or welfare. None of the individual Plaintiffs allege membership in ACT.

3. Defendants Elizabeth Dole, Secretary of the United States Department of Transportation and Ray Barnhart, Administrator of the Federal Highway Administration are charged with the enforcement of and adherence to the statutes that form the basis of this action.

4. Defendants Robert C. Lanier, Robert H. Dedman and John R. Butler, Jr. are appointed members of the Texas State Highway and Public Transportation Commission and are charged with directing the State Department of Highways and Public Transportation (SDHPT) to assist and participate in the environmental processing of SH 161.

#### History of Project

5. SHPTC passed Minute Order 62250 on May 6, 1969, establishing an outer loop highway around Dallas County, designated Loop 9. Defendants' Exhibit 1 (DX 1).

6. For purposes of environmental processing and public hearings, Loop 9 was divided into four "legs". The west leg of Loop 9 was to originate at the intersection of Interstate Highway (IH) 20 in Grand Prairie north to Denton Tap Road in Coppell, Texas. DX 14, 78.

7. SHPTC passed Minute Order 63299 on January 30, 1970, authorizing State Highway Spur 484 in Irving from IH 635 southwesterly to an intersection with the proposed route of the west leg of Loop 9. DX 16.

8. Following published notice, a public hearing on the route location of the west leg of Loop 9 and the route location of Spur 484 was held in Grand Prairie on April 15, 1970. DX 29, 30, 31.

9. SHPTC passed Minute Order 64852 on April 29, 1971, approving the route of the west leg of Loop 9 between IH 20 and Rock Island Road in Grand Prairie. DX 67, 78.

10. The route for the west leg of Loop lies in the same corridor as does the route for proposed SH 161. The alignment of the two roads diverges in the area near C.P. Waggoner Park and near the intersection with U.S. 80. DX 437, 438; Englert testimony.

11. The Final Environmental Impact Statement (FEIS) for the west leg of Loop 9 was approved by the Federal Highway Administration (FHWA) on August 17, 1971. DX 98.

12. Following published notice, a public hearing for the design of the west leg of Loop 9 from IH 20 north to NW 19th Street, north of Kensington/Cain Street, was held in Grand Prairie on June 14, 1973, and, subsequently, FHWA approval of the design was published. DX 134, 135, 136, 137.

13. Following published notice, a public hearing for the design of the west leg of Loop 9 from NW 19th Street, north of Kensington/Cain Street, to north of the Rock Island Road in Grand Prairie was held on January 15, 1975. DX 202, 204, 205.

14. No further public hearings on SH 161 have been held since January 15, 1975.

15. On October 21, 1977, SHPTC cancelled Loop 9 as part of the State Highway System (Minute Order 73581) after failure of a bond issue and designated a controlled access state highway described as originat-

ing at IH 20 in Grand Prairie northerly to SH 114 in Irving by Minute Order 73580. This highway subsequently was designated SH 161 by SHPTC. DX 242, 243.

16. On October 31, 1979, SHPTC lengthened SH 161 by the addition of Spur 484. The designation of Spur 484 was withdrawn, and the entire route from IH 20 to IH 635 carried the designation of SH 161 by Minute Order 76416. DX 270.

17. The City of Grand Prairie and many Grand Prairie residents who lived in the area of Waggoner Park began an effort in 1971 to urge the shift in alignment of West Loop 9 from its present location through the Wildwood Oaks residential area near Waggoner Park into the park itself. Plaintiff Englert authored a petition, ultimately signed by 284 citizens, requesting such a shift. DX 108, 205, at 22, 52, 58.

18. In 1979 FHWA determined that a "Section 4(f) evaluation", pursuant to 49 U.S.C. § 1653(c), would be necessary before the utilization of any public parkland for the right-of-way of SH 161. A final 4(f) evaluation, determining that there existed no feasible and prudent alternative to the utilization of parkland, was approved by FHWA on April 3, 1981. As a part of the determination, FHWA required that the City of Grand Prairie provide replacement land contiguous to the park which was suitable for park development. DX 306, 306A.

19. As a result of this shift in alignment, approximately 11 acres of Waggoner Park became included in the right-of-way for SH 161.

20. An alignment modification of SH 161 between its proposed intersection with U.S. 80 northerly to NW 19th Street was approved by FHWA on December 14, 1982, upon advice from SDHPT that each property owner and tenant affected by the shift alignment had been contacted, informed and asked to comment. DX 351.

21. The entire route of the SH 161 project was re-evaluated in 1984 by FHWA, pursuant to 23 C.F.R. 771.129. The Re-evaluation concluded that changes in the

project since the FEIS was approved for the west leg of Loop 9 in 1971 were minimal and that no new significant impacts were identified that required the development and processing of a supplemental Environmental Impact Statement. DX 410. No public hearings were held on the Reevaluation, and the resulting document was not circulated among other federal agencies or the public for comment.

22. Plaintiffs have stipulated that they will not suffer any injury from the construction of SH 161 in the City of Irving, north of Rock Island Road. Stipulation of May 23, 1984.

*Jurisdiction and Standing: Conclusions*

■ 1. This Court has subject matter jurisdiction of this case under 28 U.S.C. § 1331. *Environmental Defense Fund v. Corps of Engineers*, 348 F.Supp. 916 (D.Miss.1972), *aff'd*, 492 F.2d 1123 (5th Cir. 1974).

2. The Court has jurisdiction over all parties in this case.

3. Venue is proper in the Northern District of Texas, Dallas Division.

■ 4. Although the Court has doubts as to the standing of Plaintiff ACT to seek relief in this case, *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); *Sierra Club v. SCM Corp.*, 747 F.2d 99, 103 (2d Cir.1984), the individual Plaintiffs have alleged sufficient and specific injuries-in-fact to prove standing. Stipulation on Testimony of Plaintiffs; *Joseph v. Adams*, 467 F.Supp. 141, 149 (E.D. Mich.1978).

*NEPA: Findings and Conclusions*

■ 1. The National Environmental Policy Act of 1969, (NEPA), 42 U.S.C. § 4321 *et seq.*, requires federal agencies to consider the significant environmental consequences of their actions and to inform the public of the results of their research. *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983). NEPA's requirements are "essen-tially procedural", *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978), and the scope of judicial review of an agency's compliance with NEPA is limited. *Texas Committee on Natural Resources v. Marsh*, 736 F.2d 262 (5th Cir.1984), *modified*, 741 F.2d 823 (1984).

The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious. *Baltimore Gas, supra*, 103 S.Ct. at 2753. Courts must not "fly speck" an EIS, *Sierra Club v. Sigler*, 695 F.2d 957, 965 (5th Cir.1983), *reh. denied*, 704 F.2d 1251 (5th Cir.1983), and must "avoid placing extreme or unrealistic burdens on the compiling agency". *Isle of Hope Historical Ass'n, Inc. v. United States Army Corps of Engineers*, 646 F.2d 215, 220 (5th Cir.1981) (per curiam).

■ The burden of proof remains on Plaintiffs to establish the inadequacy of NEPA actions by a preponderance of the evidence, rather than by a prima facie showing of deficiencies. *Sierra Club v. Morton*, 510 F.2d 813, 818 (5th Cir.1975).

2. Defendants do not claim that the construction of SH 161 is not a "major Federal action significantly affecting the quality of the human environment", 42 U.S.C. § 4332(2)(c), thus not triggering the need for preparation of an EIS. Rather, Defendants argue that the EISs prepared in the early 1970's for the west leg of Loop 9 and for Spur 484 are applicable to SH 161. Technically, the application of the two EISs would require the truncation of the analysis of the west leg of Loop 9 at SH 114 and the appending of Spur 484. Plaintiffs vehemently insist that the two roads are different projects and that no EIS applicable to SH 161 has ever been prepared.

3. Plaintiffs base their contention on the evidence of alignment shifts of several hundred feet in the areas near Waggoner Park and U.S. 80 from the locations of Loop 9 and SH 161, and the approximate

halving of the width of the right-of-way in the present plans for SH 161.

4. Although the change in name of the road, of course, does not automatically make it a different project, a significantly different range of environmental impacts would mandate a statutory demarcation between the projects. The Court recognizes a trade-off between the planning benefits derived from the preparation of an EIS very early in the life of a project, *see Friends of the Earth, Inc. v. Coleman*, 518 F.2d 323 (9th Cir.1975), and the likelihood of various changes in the nature of the project as time progresses and practicalities come into focus. This consideration, however, is more directly addressed in a review of the reasonableness of the agency's decision on the question of supplementation in light of changes in the project. The Loop 9 and Spur 484 EISs, controlled access highways in the same corridor as SH 161, are applicable as starting points for the environmental processing of SH 161.

5. Plaintiffs further allege improper segmentation of the highway projects. As a general rule under NEPA, segmentation of highway projects is improper for purposes of preparing environmental impact statements. *Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 439 (5th Cir.1981). Factors to be considered include whether the proposed segment (1) has logical termini, (2) has substantial independent utility, (3) does not foreclose the opportunity to consider alternatives, and (4) does not irretrievably commit federal funds for closely related projects. *Id. See also* 23 C.F.R. 771.111(f).

6. Plaintiffs argue that the 22.9 mile west leg of Loop 9 was improperly segmented from the entire Loop 9. The circumferential Loop 9 concept had indeed existed for several years prior to the initial actions concerning its west leg. The west leg, at the time of EIS, terminated at a junction with Denton Tap Road, a rural thoroughfare, north of Sandy Lake Road and, as the testimony reflected, not near any potential traffic generator. Neverthe-

less, the illogic of a terminus is at best a secondary inquiry, *Citizen Advocates for Responsible Expansion v. Dole*, 586 F.Supp. 1094, 1102 (N.D.Tex.1984), shadowed by the independent utility inquiry. The Court is of the opinion that the west leg had independent utility at the time of preparation of the EIS. Its purpose was to provide a north-south route from Grand Prairie to Coppell. This purpose is independent from the purpose of the entire loop. The legs of Loop 9 were not proposed for contemporaneous construction; the west leg was slated for advancement on its own. To consolidate it into a Loop 9–wide EIS would prevent a reasoned basis for analyzing the environmental consequences of proceeding with any one leg alone. The inclusion of the west leg as part of an overall transportation planning scheme does not mandate the preparation of an EIS for the entire plan at the time the individual projects are proposed. *Movement Against Destruction v. Volpe*, 361 F.Supp. 1360 (D.Md.1973), *aff'd*, 500 F.2d 29 (4th Cir.1974).

7. Proposed Spur 484 was a controlled access highway 3.4 miles in length following the alignment of the existing Valley View Lane. Its termini were at Loop 9 near Belt Line Road and IH 635. DX 115. Without Loop 9 in place, Spur 484 would terminate in a field. PX 133. Nevertheless, Spur 484 was planned to link two previously-designated major crossroads, and, despite the element of circularity, has independent utility as an interconnector. Such an approach was consistent with the applicable FHWA procedures in effect at the time. DX 421; *Daly v. Volpe*, 514 F.2d 1106 (9th Cir.1975). Moreover, it is unclear from what Spur 484 is argued to have been segmented.

8. The policy underlying the segmentation doctrine should not get lost in this plethora of factors. The motivating concern is the prevention of agency evasion of NEPA by carving up one project or related projects into segmented bits too small to allow for consideration of environmental matters on a broad scope. *See Citizen*

*Advocates, supra.* The lengths of highway covered in each EIS are theoretically sufficient for such consideration.

■ 9. The Court thus turns to the evaluation of the adequacy of the EIS for the west leg of Loop 9. DX 78. The criteria to guide this evaluation have been summarized in *Marsh, supra:*

(1) whether the agency in good faith objectively had taken a hard look at the environmental consequences of a proposed action and alternatives;

(2) whether the EIS provides detail sufficient to allow those who did not participate in its preparation to understand and consider the pertinent environmental influences involved; and

(3) whether the EIS explanation of alternatives is sufficient to permit a reasoned choice among different courses of action.

■ 10. A threshold question is the function in this evaluation of the "Route Study Report" on Loop 9. The first page of the FEIS states that it had been prepared "in connection with a Route Study Report on SH Loop 9". The Court is of the opinion that the Route Study Report does not form a part of the EIS. It was not attached to the EIS, nor did it accompany the EIS on its circulation. *See* DX 78 (cover letter), 87, 88. Although the EIS may make reference to detailed studies done elsewhere, *Randolph Civic Ass'n v. WMATA,* 469 F.Supp. 968, 970 (D.D.C.1979); *Inman Park Restoration v. Urban Mass Transit Administration,* 414 F.Supp. 99, 120 (W.D.Ga.1976), *aff'd,* 576 F.2d 573 (5th Cir.1978), and generally available upon request, the cursory reference noted above falls far short of the regulations governing incorporation by reference. *See* 40 C.F.R. § 1502.21, *Markewich v. Adikes,* 422 F.Supp. 1144, 1147 (E.D.N.Y.1976). No proper adoption or other incorporation by reference of the Route Study Report by the federal agency, charged with primary NEPA responsibility, appears in the record. No explanation or hint is given as to what one could find by reading the Route Study Report.

■ The EIS must gather in one place the discussion of environmental impacts and alternatives so that it serves as a comprehensive document on which responsible agency officials and others might rely. *Sierra Club v. Froehlke,* 359 F.Supp. 1289, 1341 (S.D.Tex.1973). While the Court will consider the Route Study Report in conjunction with testimony for guidance on whether the agency considered certain factors before deciding not to treat them in the EIS, *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971); *Life of the Land v. Brinegar,* 485 F.2d 460, 473 n. 14 (9th Cir.1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974), the EIS must pass or fail on its own merits.

*Flooding*

11. The route of proposed SH 161 traverses the watershed of Johnson Creek. In recent years, Johnson Creek has flooded on an annual basis, occasionally severely. As a result, many homes and at least one school have been deluged in the area. PX 123–131. Plaintiffs argue that the EIS failed to examine the potential of increased flooding caused by the added imperviousness of SH 161, associated secondary development and eventual redevelopment.

12. Plaintiffs presented the testimony of an expert witness, Dr. Max Spindler, who conducted a study of the hydraulics and hydrology of the watershed, based on the planned and ultimate land uses of the tracts in the various sub-drainage areas. His report however, utilized assumptions far beyond even a worst-case scenario, *i.e.,* assumed the introduction of all run-off from SH 161 at one physically impossible point, and contained erroneous data. Even without separating out the contribution of SH 161 from the remaining background of ultimate development, most of which would occur without the presence of SH 161, the confidence interval utilized in the Spindler study yielded a conclusion that the increase in water surface elevation would be statistically insignificant.

12. A study prepared in 1984 for Defendants by the engineering firm of Nathan D. Maier Consulting Engineers documents and supports the agency's conclusion that SH 161 would not cause an increase in flooding in the Johnson Creek watershed. Of particular significance is the extremely high degree of imperviousness of the clays that form much of the soil of the watershed. The methodology of the Maier study is far more realistic and detailed than the Spindler analysis.

■ 13. Plaintiffs have not proven by a preponderance of the evidence that SH 161 will cause an increase in flooding. Discussion of flooding need not be included in the EIS. *Sierra Club v. Sigler*, 695 F.2d 957 (5th Cir.1983); *Save Our Ten Acres v. Kreger*, 472 F.2d 463, 467 (5th Cir.1973).

■ 14. Although it will be necessary to bridge Johnson Creek, Defendants have prepared a design for a bridge that will neither be overtopped nor obstruct the flow of water. Defendants are entitled to the presumption that the bridge will be properly constructed and the EIS need not contain a discussion of theoretical flooding impacts that could be caused if the project were improperly designed. *Russ v. Texas*, 16 E.R.C. 1652, 1656 (N.D.Tex.1979), *aff'd*, 634 F.2d 1352, 16 E.R.C. 1822 (5th Cir.1980).

*Air Pollution*

15. The discussion of air pollution in the EIS consists of the following three statements:

> The design for this highway project will provide for smooth flow of traffic which will minimize air ... pollution created by motor vehicle operation; and
> The project will not: (i) lead to significantly increased air ... pollution in the area". FEIS at 2.
> The use of this highway will create some degree of water, noise and air pollution due to the volumes of motor vehicles that will use the facility. However, this project will be designed to minimize this pollution through the use of flat grades, gentle curves, wide median and right-of-

way, smooth roadway surfaces, etc. This type of pollution can be expected to occur as this area of Dallas County experiences its ultimate urban development whether or not the highway project is constructed. FEIS at 3.

16. The Court is cognizant of the fact that at the time of preparation of the EIS the Clean Air Act was in its infancy. Nevertheless, it is impossible to hold that such a discussion complies with the requirement that it be a "detailed statement" on an adverse environmental impact. *See County of Suffolk v. Secretary of Interior*, 562 F.2d 1368, 1375 (2d Cir.1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978); *Residents in Protest—I-35E v. Dole*, 583 F.Supp. 653, 664 (D.Minn.1984).

■ 17. SH 161 will cause an increase in emissions of hydrocarbons and volatile organic compounds in its corridor. Webb testimony. Without reference to the volume of traffic, projected speeds, or, more basically, the definition of "significance", the evaluation of air pollution in the FEIS leaves an interested decision maker clueless as to the effect of the project on air quality.

18. Defendants have presented no evidence to justify this conclusion. With respect to air quality, the EIS is vague and conclusory. *EDF v. Froehlke*, 473 F.2d 346 (8th Cir.1972).

*Noise Pollution*

19. The discussion of noise pollution in the FEIS is as follows:

> The design for this highway project will provide for smooth flow of traffic which will minimize ... noise pollution created by motor vehicle operation. (p. 2).
> The project will not (a) lead to a noticeable change in the surrounding noise level for a substantial number of people. (p. 2).
> The use of this highway will create some degree of water, noise and air pollution due to the volumes of motor vehicles that will use the facility. However, this

project will be designed to minimize this pollution through the use of flat grades, gentle curves, wide median and right-of-way, smooth roadway surfaces, etc. This type of pollution can be expected to occur as this area of Dallas County experiences its ultimate urban development whether or not the highway project is constructed. (FEIS at 3).

20. Plaintiffs presented the testimony of Dr. Hal Watson, Jr., of the faculty of Southern Methodist University, and former Noise coordinator for the United States Environmental Protection Agency, Region VI. He stated that, even considering the primitive nature of noise analysis in 1971, the FEIS did not constitute a good-faith effort to address the problems of noise. He testified that it cannot be said, for example, that the smooth flow of traffic will reduce noise without reference to the speed of the vehicles. He further opined that the second statement noted above was illogical, incorrect and definitely in bad-faith.

21. Defendants did not produce any documentation or testimony to explain or buttress this conclusion. Although a divergence of scientific views will not void an EIS, *Life of the Land v. Brinegar*, 485 F.2d 460, 475 (9th Cir.1973), the Court is of the opinion that the FEIS does not contain sufficient information to inform a decision maker of the effect that SH 161 will have on noise levels in its corridor. Such unabashedly justificatory language is cursory, conclusory and inadequate. *I–291 Why? Ass'n v. Burns*, 372 F.Supp. 223, 253 (D.Conn.1974), *aff'd*, 517 F.2d 1077 (2d Cir. 1975) (finding comparable noise discussion in 1972 EIS on highway project to be inadequate).

### Economic Impact

22. Plaintiffs object to the EIS's failure to recognize a decrease in appraised value of residential property near the route of SH 161. Plaintiffs' expert, Robert Martin, who is a lecturer in finance and real estate at The University of Texas at Arlington and a licensed real estate broker and ap-praiser, testified that, as the road is completed, adverse effects will be seen in residential property values, directly correlated with the value of improvement. He further stated that the project will cause an acceleration in the decay of neighborhoods near the project. He criticized a study prepared by Craig Farmer for the City of Grand Prairie, which forecast solely positive effects, because it relied on a 1959 "Adkins Report" that was not intended to be used as a general model.

23. Defendants offered the testimony of Craig Farmer, former Director of Planning of the City of Grand Prairie, who defended the conclusion, albeit implied, that SH 161 would increase the *net* value of the land in its corridor. DX 78, p. 3; DX 425. He completed a study that concluded that the construction of SH 161 would yield an increase of 130% in property values within 600 feet of the center line when final land uses were settled. He defended the use of the Adkins Report because it was the only available resource.

24. Although NEPA emphasizes the need for multidisciplinary analysis, economic and social impacts clearly occupy a lesser tier of importance in an EIS than do purely environmental or ecological concerns. Indeed, absent a primary impact on the physical environment, economic factors need not be examined in an EIS. *Property Owners Ass'n of Deep Creek Lake, Inc. v. Gorsuch*, 601 F.Supp. 220, 224 (D.Md.1983).

25. The Court is of the opinion that the discussion of economic impact is barely adequate. Although only contained in four sentences (at 1, 4), the FEIS states that SH 161 will improve access, and improved access will yield improved property values. Although it would have been preferable to consider these impacts in more detail, these remarks stated an assumption and a conclusion. These snippets at least recognized the issue and provided a springboard for discussion. *See Stop H–3 Ass'n v. Dole*, 740 F.2d 1442, 1461–2 (9th Cir. 1984).

*Treatment of Alternatives*

26. Plaintiffs also challenge the adequacy of the EIS on the ground that the statement did not properly consider all of the available alternatives to the construction of a highway of the alignment contemplated. Section 102(2)(c)(iii) of NEPA requires a federal agency in assessing the environmental effects of a project to discuss alternatives to the proposed action. The purpose of the alternatives requirement is to assure that the government agency as a decision-making body has considered methods of achieving the desired goal other than the proposed action. *Piedmont Heights*, 637 F.2d at 436.

■ An environmental impact statement may not be held insufficient by a court merely because the agency has failed to discuss in it every conceivable alternative to the proposed project. Federal agencies must be free to make reasonable limitations on the scope of their discussions of such alternatives. *Texas Committee on Natural Resources v. Marsh*, 741 F.2d 823, 824 (5th Cir.1984) (on rehearing).

27. In the FEIS on the west leg of Loop 9, three different routes and the "no-build" alternative were evaluated. Although a marginally more probing analysis can be found in the Route Study Report, the FEIS examined the three routes in terms of estimated costs and displacements. The FEIS states that "the chosen route ... represents the best possible location from an environmental standpoint." FEIS at 5. No explanation is given for this conclusion. Curiously, the no-build "alternate (sic) would have a greater negative impact on the environment as it would ... increase noise, water, and air pollution, etc." *Id.* No mention is made of the possibilities for mass transit.

■ 28. The degree to which any alternative must be discussed in an EIS must be measured by a "rule of reason". *Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068 (1st Cir.1980). The discussion of alternatives is the linchpin of an EIS. *Monroe County Preservation Council,*

*Inc. v. Volpe*, 472 F.2d 693, 699–700 (2d Cir.1972). The discussion of alternatives in this EIS does not contain any information that enables a decision maker to draw a reasoned conclusion about the comparative environmental risks of the proposed alternatives. *See Akers v. Resor*, 443 F.Supp. 1355 (W.D.Tenn.1978).

The Route Study Report's more thorough examination of environmental aspects of alternatives cannot cure the deficiencies of the EIS. *See* discussion above; *Grazing Fields*, 626 F.2d at 1072; *Pennsylvania Protect Our Water v. Appalachian Regional Comm'n.*, 574 F.Supp. 1203, 1219 (M.D.Pa.1982). Without a specific reference to the Route Study Report "as the underlying source of the recommendation", *Piedmont Heights*, 637 F.2d at 438, the FEIS must fend for itself.

The Route Study Report may, however, set the standard for how much discussion a particular alternative merits. *Grazing Fields*, 626 F.2d at 1074. Nothing in the Report, however, indicates that the alternative routes are unreasonable or speculative.

29. The failure of the FEIS to consider as an alternative the use of Roy Orr Boulevard does not constitute a defect. Work on Roy Orr Boulevard was commenced in 1977, Englert testimony, and thus was not a "then-existing" alternative at the time of the preparation of the FEIS. *Roosevelt Campobello International Park v. EPA*, 684 F.2d 1041, 1047 (1st Cir.1982).

*Supplementation*

30. Plaintiffs further contend that defendants violated NEPA by failing to produce a supplemental environmental impact statement.

■ 31. A federal agency has a continuing duty to gather and evaluate new information relevant to the environmental impact of its actions, even after release of an EIS. *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1023–24 (9th Cir.1980).

■ Federal regulations require the preparation of supplemental statements

"when there have been significant changes in the proposed action, the affected environment, the anticipated impacts, or the proposed mitigation measures." 23 C.F.R. § 771.189(b). The emphasis of this regulation is on the environmental effect that substantial changes or additional information will have on the project. *Peidmont Heights*, 637 F.2d at 442. The principal factor to be considered is whether the changes yield a "seriously different picture of the environmental landscape". *Wisconsin v. Weinberger*, 745 F.2d 412, 420 (7th Cir.1984). Mere passage of time is of course insufficient to require the preparation of a supplemental EIS. *North Slope Borough v. Watt*, 20 ERC 1457, 1465 (D.Alas.1984). It also goes without saying that a change in the name of a project is insufficient to require supplementation.

32. Passage of time, however, can compel a re-evaluation. FHWA regulations require the preparation of an environmental re-evaluation if major steps to advance the project have not occurred within three years from the date of approval of the FEIS. 23 C.F.R. 771.129(c)(2). Defendants complied with this requirement by preparing an environmental re-evaluation in 1984. DX 410.

33. Plaintiffs contend that changes in the project require supplementation. Among these changes are the halving of the right-of-way from that originally analyzed, the shifts in alignment into public parkland, and a dramatic shift in traffic projections at the northern and southern termini of the highway.

■ 34. A change in alignment of a road so as to traverse public parkland has been held to be a *per se* criterion for supplementation. *Stop H-3 Ass'n v. Lewis*, 538 F.Supp. 149, 170 (D.Hawaii 1982), *modified on other grounds*, 740 F.2d 1442 (9th Cir.1984). *See also* 23 C.F.R. § 771.10(e)(1) (1980); DX 410 at 8–13 (predecessor DOT guidelines) (both stating that any matter having more than minimal effect on properties protected under § 4(f) is "significantly affecting" the environment). The Court agrees with this analysis, particularly when the parkland contains relatively unique vegetation, such as the much-discussed grove of burr oaks. Bacon testimony.

■ 35. Supplementation has also been required to consider overall environmental effects when a project is created that consists of two segments of highway, in connection with each of which an EIS had been prepared. *Swain v. Brinegar*, 542 F.2d 364 (7th Cir.1976).

36. The air quality portion of the re-evaluation reveals that SH 161 will have a measureable impact on air quality, and noted that one residence will experience a carbon monoxide concentration that will approach the eight hour standard.

DX 410 at 41. This passage also notes that it is only a summary of the entire analysis, available from SDHPT. *Id.* at 42. Due to the deficiencies in the original FEIS, it is impossible to determine whether this data reflects a different environmental impact based on the revised traffic projections, new information, or both. Nevertheless, this report contains data necessary to make the FEIS sufficient and thus should have been properly circulated. *Natural Resources Defense Council, Inc. v. Callaway*, 389 F.Supp. 1263 (D.Conn.1974), *rev'd in part on other grounds*, 524 F.2d 79 (2d Cir.1975). Without a supplement, the FEIS did not describe the likely environmental harms well enough to allow the Secretary to make an informed decision. *Massachusetts v. Watt*, 716 F.2d 946, 948 (1st Cir. 1983).

37. The noise pollution analysis of the re-evaluation, at pages 44–57, is even more disconcerting. The report contains a sophisticated noise analysis of 23 segments of the proposed route. In measuring the background noise levels, ten of eighteen sites exceeded the FHWA Noise abatement criteria due to the presence of major cross streets, industrial parks, airplane flyovers and railroads.

The report projected the predicted noise levels after completion of the highway. Using a standard of significance of a 15dB(A) increase, the report found that a

significant increase would occur or the Department of Transportation's noise abatement criterion of 70dB(A)(L10) would be exceeded at as many as 46 receptor locations after the construction of SH 161. DX 420 at 56–57. Defendants argue that these "significant increases" are not significant for NEPA purposes, primarily because, of these 46 locations, 42 of these sites presently exceed the criterion.

38. Plaintiffs' expert, Dr. Watson, sharply criticized the methodology employed in the re-evaluation, particularly the definition of a significant increase in noise levels being found at or about 15dB(A). He testified that this was "shocking". Watson's findings, based on a substantially smaller sampling of sites that was done in the re-evaluation, predicted that some 500 homes and 180 apartments would suffer from exceedance of the 70dB(A) criterion.

39. Defendants' noise expert, Roger Wayson of SDHPT, who prepared the noise analysis in the re-evaluation, defended the criteria selected as being those used by many other states in performing this type of analysis.

40. The Court is of the opinion that Defendants' methodology for noise analysis was reasonable. *See Sierra Club v. U.S. Department of Transportation*, 753 F.2d 120, 128 (D.C.Cir.1985).

41. The decision not to supplement on the basis of these noise findings was unreasonable. SH 161 would cause, for the first time at at least four sites, violations of the noise abatement criterion to levels regarded by Defendants' own report as "significant increases". At least forty-two other sites are pushed farther above the already-exceeded criterion. Although the marginal increases attributal to SH 161 may or may not be perceptible to the human ear, *see Citizen Advocates*, 586 F.Supp. at 1107, noise impact would always elude NEPA unless one regards exceedance of certain generally accepted criteria as cause for concern. The 70dB(A) standard recognized by FHWA, above which there is the potential for health effects and interference with

learning, PX 29; Watson testimony, is such an appropriate standard.

42. If an impact of significance is found by the agency, a supplemental EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum. *Sierra Club v. Peterson*, 717 F.2d 1409, 1413 (D.C.Cir.1983). Although the violation of the DOT noise abatement criteria triggers consideration of mitigation measures, the testimony revealed that such measures are not mandatory and are only taken if cost effective. Wayson testimony.

43. Thus, in the realm of noise impact, significant new information and changes in the quality of the noise impact, necessitated supplementation of the EIS.

44. The Court has previously noted that the width of the right-of-way for the SH 161 project is to be half that of the west leg of Loop 9, evaluated in the FEIS. A mere change in the quantity of land for a project does not alone constitute a project change or basis for supplementing the EIS. *Environmental Defense Fund v. Marsh*, 651 F.2d 983, 993 (5th Cir.1981). These changes must be viewed in terms of their environmental impacts. As reflected above, the narrowing of the right-of-way contributed to an increase in noise levels, the significance of which required supplementation of the EIS.

45. The reduction in amount of right-of-way would also have an effect on adjoining residential property values. Martin testimony. Appendix A to the re-evaluation, a February 6, 1984, interoffice memorandum on the subject of "Economic/Land Use Effects of Proposed SH 161" does contain a requisite "hard look" at this problem. The Court cannot say that the agency's assessment of the significance of the change of these economic effects was unreasonable.

46. Finally, Plaintiffs point to the fact that there is no identity between the businesses slated for dislocation by Loop 9 in the EIS and those labeled as being in the path of SH 161. Moreover, the FEIS described the necessity for displacing 65 mo-

bile homes which have been spared by the shift in alignment of SH 161. The Court has been unable to find any authority pertinent to the scope of the duty to discuss dislocations. Accordingly, the agency properly took a "hard look" at the dislocations necessary, described the agency's plans for assistance and apparently concluded that the changes in identity did not constitute a significant new environmental impact. The Court will not dislocate this determination.

47. It is tempting to regard the masterful re-evaluation as curing the defects of the FEIS. The re-evaluation did not, however, comply with the NEPA process. *See I–291 Why?, supra.* No public hearings were held on the re-evaluation. Its circulation within the federal government was apparently limited to FHWA. Lombard testimony.

Intra-agency consideration lacks the benefits secured by discussion in the EIS. NEPA contemplates that full disclosure of the basis for agency action be made to other departments of government and the public at large. *Pennsylvania Protect Our Water,* 574 F.Supp. at 1219, *quoting Grazing Fields, supra.* Failing to circulate a SEIS hampers the flow of information to the public by making more difficult the endeavors of watchdogs who could reasonably be expected to publicize the environmental issues present, and would tend to mute those most likely to identify problems and criticize decisions. *Id.; Scherr v. Volpe,* 466 F.2d 1027, 1033 (7th Cir.1972).

## § 4(f) Claims

1. Section 303(c) of the Transportation Code provides that:

The Secretary may approve a transportation program or project requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, state, or local significance, or land of a historic site of national, state or local significance (as determined by one Federal, State, or local official having jurisdiction over the park, area, refuge, or site) only if—

(1) there is no prudent and feasible alternative to using that land; and

(2) the program or project includes all possible planning to minimize harm to the park ... resulting from the use.

49 U.S.C. § 303(c) (1982). (*See also* 23 U.S.C. § 138.)

2. On August 11, 1967, the Department of Housing and Urban Development (HUD) entered into an agreement with the City of Grand Prairie to provide financial assistance to the city for the purchase of land for C.T. Waggoner Park. DX 304.

3. On December 8, 1972, HUD entered into an Amendatory Contract with the City, approving the deletion of a 10.13 acre parcel of land from Waggoner Park for the right-of-way of West Loop 9. The contract also approved the substitution of 11.8148 acres of land adjacent to Waggoner Park (the Grantham tract) for the parcel deleted. DX 304.

4. The substitute land is basically treeless and more suitable for active recreation than is the portion of Waggoner Park, a wooded area suitable for nature study and picnics. Martin testimony. The wooded acreage from Waggoner Park represents approximately 18.6% of all of the wooded acreage of public parks within Grand Prairie. *Id.*

5. The City of Grand Prairie is presently in the process of acquiring the substitute land.

6. The west leg of Loop 9 did not traverse Waggoner Park. DX 78. The shift in alignment resulted from the outcry of many residents of the area to the west of the Park whose homes were in the right-of-way of Loop 9. DX 108. At the design public hearing on January 15, 1975, Plaintiffs Englert and the Mayor of Grand Prairie spoke in favor of moving the highway into the park. DX 205 at 22, 75.

7. A 4(f) determination that there was no feasible and prudent alternative to the use of a portion of Waggoner Park was made by the Regional Federal Highway Administrator on April 8, 1981.

8. Plaintiffs object to the rejection of an alternative alignment immediately to the east of Waggoner Park, obviating the residential displacements and the use of parkland. This suggestion was identified by a yellow line on DX 436.

9. The 4(f) determination stated: "Routing the facility east of the park would either require functional replacement of the Eisenhower Elementary School, or have a severe impact on the school. Therefore, a routing to the east of the park was avoided." DX 307, attachment at 2.

10. Plaintiffs also argue that the substitution of qualitatively different parkland, lying in a flood plain, does not properly minimize the harm to the park.

11. Section 4(f) is part of Congress' response to the growing public concern over the preservation of our Nation's natural beauty. *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 404, 91 S.Ct. 814, 817, 28 L.Ed.2d 136 (1971). It is obvious that the requirements of section 4(f) are stringent. *Stop H–3 Ass'n, supra*, 740 F.2d at 1447.

 12. As to all of the Secretary's section 4(f) determinations, the standard of judicial review is whether the Secretary's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law". Administrative Procedure Act, 5 U.S.C. § 706(2)(A) (1982); *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823. While the Secretary's decisions are entitled to a presumption of regularity, that presumption does not "shield his action from a thorough, probing, in-depth review." *Overton Park*, 401 U.S. at 415, 91 S.Ct. at 823. The factors to be considered are whether:

1. The Secretary acted within the scope of his authority (not at issue here).
2. The Secretary properly construed his authority to approve the use of parkland as limited to situations where none of the alternatives to such use are feasible and prudent (not at issue here).
3. The Secretary could have reasonably believed that in the case under review there are no feasible and prudent alternatives (at issue here).
4. The Secretary's decision was based on a consideration of the relevant factors. (at issue here).
5. The Secretary made a clear error of judgment (at issue here).
6. The secretary's action followed the necessary procedural requirements (not at issue here). *Id.* at 415–417, 91 S.Ct. at 823–824.

This Court must draw upon *Overton Park's* definition of a "feasible and prudent alternative". To be not "feasible", the Secretary must find that as a matter of sound engineering it would not be feasible to build the highway along any other route. 401 U.S. at 411, 91 S.Ct. at 821. Parkland may be "used" for highway purposes only if "there [are] truly unusual factors present in [the] case", if "feasible alternative routes involve uniquely difficult problems", or if "the cost or community disruption resulting from alternative routes [reach] extraordinary magnitudes". 401 U.S. at 413, 416, 91 S.Ct. at 822, 823. In other words, a road must not take parkland, unless a prudent person, concerned with the quality of the human environment, is convinced that there is no way to avoid doing so. *Monroe County Conservation Council v. Volpe*, 472 F.2d 693, 700 (2d Cir.1972).

 13. This Court must consider the propriety of the agency's action "solely by the grounds invoked by the agency." If those grounds are inadequate or improper, the Court is "powerless to affirm the administrative action by substituting what it considers to be a more adequate or proper basis". *Securities & Exchange Commission v. Chenery Corp.*, 332 U.S. 194, 196, 67 S.Ct. 1575, 1577, 91 L.Ed. 1995 (1947). In this case, the Court's review is thus limited to the 4(f) determination document itself. *See* DX 307 ("This Statement sets forth the basis for a determination ..."); *Stop H–3 Ass'n*, 740 F.2d at 1450 n. 13.

14. There is no basis in the determination for rejection of the eastern alternative as not feasible, from an engineering standpoint. One of Defendants' SDHPT engineers testified that he would have to look carefully at the engineering aspects of the eastern alternative, which posed some concerns, but that he had not studied its feasibility. Blain Testimony. Plaintiffs represented that the alternative route involved curves of no greater magnitude than those used in the chosen alignment.

15. The elimination of the eastern alternative must then rest on its lack of "prudence", or the presence of "costs of community disruption reaching extraordinary magnitudes." *Louisiana Environmental Society v. Coleman*, 524 F.2d 930, 933 (5th Cir.1975).

The question thus becomes whether the dislocation of an elementary school as the worst case scenario, presents such a case of imprudence. The Court is of the opinion that it does not. In *Stop H–3 Ass'n*, the Ninth Circuit examined the prudence of an alternative that would require the dislocation of one church, four businesses and thirty-one residences. (The Ninth Circuit also concluded that an additional $42 million is not a cost of extraordinary magnitude. 740 F.2d at 1452).

The court stated:

[This dislocation] no doubt is a community disruption of some magnitude. We do not believe, however, that this disruption is of the "extraordinary" magnitude required by *Overton Park*. (footnote omitted). In *Overton Park* the Supreme Court stated:

[S]ince people do not live or work in parks, if a highway is built on parkland no one will have to leave his home or give up his business. Such factors are common to substantially all highway construction. Thus, if Congress intended these factors to be on an equal footing with preservation of parkland, there would have been no need for the statutes ... But the very existence of the statutes indicates that protection

of parkland was to be given paramount importance. [citation omitted].

We find that the Secretary could not have reasonably concluded that the community displacements rose to the level required by *Overton Park*.

740 F.2d at 1451. This Court can find no basis to distinguish the result here, at least without any discussion of the relocation possibilities for the school. *See also Coalition for Responsible Regional Development v. Brinegar*, 518 F.2d 522, 526 (4th Cir.1975); *Wade v. Lewis*, 561 F.Supp. 913, 951 (N.D.Ill.1983).

■ Accordingly, the Court is of the opinion that the Secretary could not have reasonably concluded that the potential collision with a school building presented disruptions or costs of extraordinary magnitude.

### Public Hearing Claims

1. The statute governing public hearing requirements for federal-aid highway projects is found at 23 U.S.C. § 128. In pertinent part it states:

(a) any State highway department which submits plans for a Federal-aid highway project ... shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community....

Applicable FHWA regulations are found at 23 C.F.R. § 771.111(h) (1984), 23 C.F.R. Part 795 (1974), the Texas Action Plan of 1973 approved pursuant to 23 C.F.R. Part 795 (1974), and the Texas Action Plan as amended in 1976, and approved by FHWA.

2. The 1976 Action Plan provides that, when project improvements are found to be needed after the usual public-hearing process has been completed, and these improvements would not have a significant effect on the environment or the public as a whole but would affect only violated properties, meetings may be held with affected

residents. This procedure is in lieu of additional public hearings. DX 236, Appendix B.

3. As noted far above, location and design public hearings were held with respect to the section of Loop 9 and Spur 484 that have since metamorphosed into SH 161. No objections are raised to the procedural regularity of those hearings.

■ 4. The Court is of the opinion that the shift in alignment between NW 19th Street and U.S. 80, attributable to increased development in the proposed right-of-way, did not constitute a change requiring a new public hearing under the Action Plan. The environmental effects associated with the shift are not different in quality or magnitude than those associated with the previous alignment. Members of the public who had opportunity to present their views at the first hearing would not have substantially different views to present on the new alignment. *See D.C. Federation of Civic Association v. Volpe*, 316 F.Supp. 754 (D.D.C.1970), *rev'd on other grounds*, 459 F.2d 1231 (D.C.Cir.1971), *cert. denied*, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972). *See also Township of Springfield v. Lewis*, 702 F.2d 426, 447 n. 43 (3d Cir. 1983); *Citizens for Preserving Farm Land v. North Carolina Dept. of Transportation*, No. 82–89–CIV–S (E.D.N.C., May 29, 1984) at 19 (alteration of alignment by 3 or 4 miles would have no new or different social, environmental, or economic effects).

5. The shift in alignment into Waggoner Park, however, presents a different question. Such a shift presents a significant environmental impact, by the Action Plan's own definitions. DX 236., Appendix C at C–3, Part 2, ¶ B(1). Failure to hold a public hearing on this shift constituted administrative error.

6. Defendants' argument that no additional public hearing was required on the Waggoner Park shift because the shift occurred as a result of a previous § 128 public hearing is unconvincing.

The previous hearing provided a forum for those with an incentive to support a shift into the park. The defenders of the Park hold no such motivation to attend a hearing dealing with a proposal that did not imperil their concerns. Section 4(f) evaluations do not provide for a hearing.

7. Prejudicial error can be assumed where no hearing was held where one was required. *See D.C. Federation, supra*, 434 F.2d 436 (D.C.Cir.1970).

### *Laches*

1. Defendants raise the affirmative defense of laches. It is argued that Plaintiffs should have been aware of any alleged defects in the FEIS over a decade ago, of the designation of SH 161 in 1979, and of the shifts in alignment in SH 161 into Waggoner Park and the resulting hearing defects in 1981. Defendants state that SDHPT has expended more than $3,700,000 to acquire approximately 65 acres of land for right-of-way between IH–20 and Rock Island Road. Simmons testimony; DX 369. It should be noted that approximately 47 acres were acquired in connection with Loop 9. Simmons testimony.

■ 2. The defense of laches is available in environmental litigation but is disfavored because of the public interest in environmental quality and compliance with Congress' environmental policy. *Jicarilla Apache Tribe v. Andrus*, 687 F.2d 1324 (10th Cir.1982).

■ 3. The court is of the opinion that, when viewed through the prism of the strong public interests, Plaintiffs have not unreasonably delayed in bringing this suit. The claims related to Waggoner Park, and its repercussions on EIS supplementation and public hearings, sufficient to justify much of the relief sought, arose in 1981. This suit was filed in 1983. There was also no one proclamation equating SH 161 with the defunct Loop 9 and Spur 484. It is thus unclear at what point it should have been known that Defendants were intending to rely on the Loop 9 and Spur 484 documents in connection with SH 161. The

Court also notes that a laches defense in environmental cases has succeeded only where a substantial portion of the project has been completed at the time the suit was filed. *See Friends of Yosemite v. Frizzell*, 420 F.Supp. 390, 397–98 (N.D.Cal. 1976) and cases cited therein. In light of the stage of this project, and the non-perishable nature of acquired right-of-way, the Court is of the opinion that laches does not bar this action.

4. With respect to Defendants' contention of unclean hands, it is certainly true that several Plaintiffs urged the shift in alignment into Waggoner Park. The position was not, however, espoused by all Plaintiffs, and thus such a defense has no bearing on the appropriateness of the remedy.

### Remedy

1. An injunction is the most common response to a NEPA violation. *Forelaws on Board v. Johnson*, 743 F.2d 677, 685 (9th Cir.1984). The purpose of an injunction of government action pending NEPA compliance is generally, to maintain the status quo while additional environmental data is gathered and circulated, in order to preserve the decision makers' opportunity to choose among policy alternatives. *Id.* Entitlement to an injunction is not, however, automatic. The Court must examine the alleged harms to be prevented, the effect on the public interest of granting injunctive relief and must balance the equities.

2. A violation of NEPA may in itself constitute irreparable harm, *Environmental Defense Fund v. Froehlke*, 477 F.2d 1033 (8th Cir.1973), though not all NEPA violations will constitute such harm. *North Slope Borough v. Andrus*, 486 F.Supp. 326, 331 (D.D.C.1979). The harm with which courts must be concerned in NEPA cases is not, strictly speaking, harm to the environment, but rather the failure of decision-makers to properly take environmental factors into account. *Jones v. D.C. Redevelopment Land Authority*, 499 F.2d 502, 512 (D.C.Cir.1974). That harm matures simultaneously with NEPA's requirements. *Id.* When the opportunity to adequately review environmental factors is lost, the harm becomes irreparable and an injunction is necesary to preserve the decision-making process. *See State of Alaska v. Andrus*, 580 F.2d 465, 485 (D.C.Cir. 1978). Such a situation is present here.

3. Harm would result to Plaintiffs if an injunction does not issue because the last opportunity for proper consideration of environmental concerns in processing this project will pass. The Court is of the opinion that the harm to Defendants from granting the injunction is not substantial because, in reality, the actions needed to comply with NEPA, § 4(f) and § 128 are not onerous. The vast majority of the research and planning has already been completed. Given the delays already experienced in the construction of Loop 9/Spur 484/SH 161, the additional time required to properly complete the various statutory mandates does not present compelling circumstances. *See Greene County Planning Board v. Federal Power Commission*, 455 F.2d 412, 422–23 (2d Cir.1972) (delay is a natural part of the NEPA process).

4. Absent any indication of harm to the public by imperiled traffic safety or similar hazards, *see Piedmont Heights Civic Club v. Moreland*, 637 F.2d 430, 443 (5th Cir. 1981), the Court is of the opinion that the strong public interest in environmental quality favors the granting of injunctive relief.

5. Declaratory relief is also appropriate. *Save the Niobrara River Ass'n, Inc. v. Andrus*, 483 F.Supp. 844 (D.Neb.1977).

6. Plaintiffs are directed to draft a judgment consistent with these Findings of Fact and Conclusions of Law in consultation with Defendants.

7. The Court reserves determination of the matter of attorneys' fees for a later date.

SO ORDERED.