COLLIN COUNTY, TEXAS, et
al., Plaintiffs,

v.

HOMEOWNERS ASSOCIATION FOR
VALUES ESSENTIAL TO NEIGH-
BORHOODS (HAVEN), et al., Defen-
dants.

Civ. A. No. CA3–84–0376–D.

United States District Court,
N.D. Texas,
Dallas Division.

June 30, 1989.

Thomas W. Luce, III, David Bryant (argued), R. Matthew Molash (argued), and John E. Castaneda, of Hughes & Luce, Dallas, Tex., for Collin County, Texas and as representative of the plaintiff's group consisting of the City of Dallas, Tex., City of Garland, Tex., City of Plano, Tex., and City of Richardson, Tex.

Patrick R. Cowlishaw (argued) of Cohan, Simpson, Cowlishaw, Aranza & Wulff, Dallas, Tex., for City of Carrollton, Tex.

David Frederick (argued) of Law Office of David Frederick, Austin, Tex., and Mary E. Kelly of Henry, Kelly and Bunch, Austin, Tex., for HAVEN.

Marvin Collins, U.S. Atty. and Mary Ann Moore, Asst. U.S. Atty., Dallas, Tex., for Federal defendants.

Rodney D. Parrott, Asst. Atty. Gen., Highway Div., Austin, Tex., for State defendants.

## MEMORANDUM OPINION AND ORDER

FITZWATER, District Judge.

In this action to obtain a judgment declaring that a final environmental impact statement ("FEIS") for a state highway complies with the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the court must decide whether a declaratory judgment action may properly be maintained and whether the FEIS was adopted in accordance with the appropriate procedure. Answering both questions in the affirmative, the court grants plaintiffs' motion for summary judgment and denies the cross-motion of an organization that opposes construction of a segment of the highway.

### I.

In a prior reported opinion, *Collin County, Texas v. Homeowners Ass'n for Values Essential to Neighborhoods (HAVEN)*, 654 F.Supp. 943 (N.D.Tex.1987) ("*HAVEN I*"), the court has recounted much of the background facts and procedural history of this action. The court reiterates here certain of the reported facts from *HAVEN I* and additional background and procedural facts that are necessary to place in context today's decision.

Plaintiff, Collin County, Texas ("Collin County"), filed this action[1] in 1984 to obtain a declaratory judgment that the FEIS for proposed Texas State Highway 190 ("SH 190") is sufficient. *HAVEN I*, 654 F.Supp. at 945. It sued as nominal defendants several surrounding cities and federal and state agencies. Collin County also sued defendant, Homeowners Association for Values Essential to Neighborhoods

---

1. The action was originally filed as a class action. Collin County has not actively sought class certification, however. *Cf.* N.D.Tex.R. 10.-2(b).

(HAVEN) ("HAVEN"),[2] requesting as contingent relief that, if the FEIS were found sufficient, HAVEN be enjoined from interfering with construction of the highway. At the time *HAVEN I* was decided, the cities of Dallas and Garland, Texas had been realigned as plaintiffs. *Id.* n. 2. Today, the cities of Plano, Richardson, and Carrollton, Texas, and Denton County, Texas, have also been realigned as plaintiffs.[3]

State Highway 190 is a planned major east-west controlled access highway to run between Interstate Highway 35E on the west and State Highway 78 on the east. *HAVEN I,* 654 F.Supp. at 946. The highway will traverse portions of the cities of Carrollton, Richardson, Plano, and Dallas, terminating in Garland, Texas.

The concept of a major east-west highway in northern Dallas County dates back to a 1964 study of future Dallas County transportation requirements entitled, "Dallas County Development in Outer Loop Highway Needs." What is now designated as SH 190 was the northern segment of proposed Loop 9, which was intended to encircle Dallas County.[4] The proposed loop was studied in 1970. At a public hearing, City of Carrollton representatives—including the Mayor and City Planner—supported Loop 9 but requested that the highway be moved farther north to coincide with Carrollton's own planning for the Loop's location. City of Richardson residents vigorously opposed the proposed route, suggesting that the Texas State Department of Highways and Public Transportation ("DHPT") consider a more northern route that would serve Collin, Denton, and Dallas County residents.

Following the public hearing, a multi-discipline team completely restudied and re-evaluated the location and design of the route. This team thereafter recommended a principal urban arterial street (4–6 lane thoroughfare), coupled with another freeway to the north which would extend well into Collin and Denton Counties. This proposal was rejected following citizen and agency input. Ultimately, the Loop 9 project was abandoned, primarily due to funding difficulties.

Nevertheless, in 1977, because of the importance of the northern part of Loop 9 and the apparent inability to proceed with Loop 9 as a unitary project, the DHPT authorized the development of the northern sector of Loop 9 as SH 190. The DHPT authorized construction of the highway from State Highway 78 on the east to Interstate Highway 35E on the west and allocated $6 million for the initial phase of construction. Later in 1977 the Department approved $12.8 million to begin right-of-way acquisition and an additional $200,-000 for relocation costs. In 1978 the DHPT preliminarily approved a route for SH 190 (Route F) that was later rejected in favor of the route ultimately adopted. The preliminary approval was not the equivalent of a predetermined route for SH 190. In 1979 the DHPT stated that the route and design of SH 190 would proceed in the most feasible and economic manner and in accordance with departmental policies and the DHPT 20–year project development and control plan.

In early 1980 the DHPT notified the Federal Highway Administration ("FHWA") of its intention to prepare a draft environmental impact statement ("draft EIS") for SH 190. Such a statement was necessary because the highway will be paid for in part with federal funds and is a "major Federal

---

2. At the time the court decided *HAVEN I,* the court was unclear whether HAVEN was an unincorporated association of residents, homeowners, property owners, and others, *see* 654 F.Supp. at 945, or a Texas non-profit corporation called "Carrollton H.A.V.E.N., Inc.," *see id.* at n. 1. The papers filed in connection with the present motions reflect that HAVEN is a Texas non-profit corporation.

3. All plaintiffs except the City of Carrollton have joined in all portions of a uniform amended complaint. Carrollton has indicated that it does not join all the allegations and prayers of the pleading. In particular, Carrollton opposes plaintiffs' alternate request for injunctive relief.

4. The western segment of Loop 9 was redesignated as State Highway 161. The FEIS for that segment was litigated before Judge Sanders in *Association Concerned About Tomorrow, Inc. v. Dole,* 610 F.Supp. 1101 (N.D.Tex.1985).

action" within the meaning of NEPA. *See* 42 U.S.C. § 4332(2)(C). The FHWA published in the *Federal Register* a notice of intent to prepare the draft EIS. The DHPT also issued a "20 Year Project Development and Control Plan" and allocated an additional $139.7 million for the SH 190 project. The draft EIS was thereafter prepared by DHPT and was transmitted in December 1981 to affected local governmental entities in order to obtain their review and comments. The draft EIS addressed seven alternative route locations (Routes A–F and F')[5] and a "no build" alternative. It also addressed several connector combinations and two different designs.

In 1982 the Environmental Protection Agency ("EPA") determined that the draft EIS met the requirements for filing under Council for Environmental Quality ("CEQ") regulations. The notice of availability of the draft EIS was then published in the *Federal Register.* The DHPT received detailed comments on the draft EIS from the EPA, the U.S. Department of the Interior ("DOI"), and the Texas Historical Commission ("THC").

The DHPT thereafter issued a notice of public hearing concerning the combined route and design. Legal notices appeared in March and April 1982 in the principal Dallas and suburban newspapers of general circulation. The public hearing was conducted on April 29, 1982. The comments of affected governmental entities, and of the majority of citizens present, were favorable. Carrollton homeowners located near the proposed route presented mixed comments. Most urged a more northern route; others suggested a. depressed roadway.

The Mayor of Carrollton expressed the City Council's support for Route F', although he also agreed with positions taken by certain homeowners, including depressing the roadway.

At approximately the time of the public hearing, the Carrollton homeowners formed organizations for the sole stated purpose of preventing the construction of SH 190 along proposed Route F'. Homeowners residing along Trinity Mills Road formed "Citizens United to Relocate Vehicular Expressway" ("CURVE");[6] another group, "Favorable Access to Carrollton Transportation System," also formed.

As noted, the draft EIS examined seven alternative routes. In response to the opposition to Route F', the FHWA and the DHPT studied two more routes, Routes G and J, and analyzed these routes in the FEIS. Routes G and J addressed the concerns of Carrollton homeowners. The FEIS modified the proposed design of Route F' through part of Carrollton to ameliorate concerns raised by area residents. Specifically, the FEIS proposed depressing SH 190 between Old Denton Road and Kelly–Springfield Road in Carrollton to provide a continuous "wall" to abate noise. Routes G and J were found to be unsatisfactory, however, primarily because they benefited a smaller group of people at significant added cost. A major focus of the FEIS is the comparison and evaluation of alternative Routes G and J with Route F'.[7]

The attempts at redesign did not placate CURVE. In the Spring 1983 municipal elections, CURVE supported a slate of candidates opposed to the alignment. Most of the slate was elected. The new Carrollton

---

5. Through the Carrollton area, Routes A and B generally followed the alignment of Trinity Mills and Weber Roads. Routes C, D, and E ran south of Trinity Mills Road. Routes F and F' also generally followed the alignment of Trinity Mills Road. Alternative F' is identical to Alternative F except for the area north of Marsh Lane to Coit Road.

6. There is evidence in the summary judgment record that CURVE is essentially the predecessor of HAVEN and that the two organizations had overlapping membership. HAVEN's first president stated, however, that members of

CURVE's leadership were barred from holding officer or trustee positions in HAVEN.

7. These routes were examined in terms of plants and animals, prime and unique farmland, water quality, stream modification, wetlands and coastal zones, flood hazards, transportation, and land use. Each alternative route was also considered in light of its potential impact on the economy, relocation, air quality, traffic and construction noise, energy, land use planning, history, archaeology, construction, and § 4(f) properties.

City Council withdrew Carrollton's endorsement of Route F' and requested a more northern corridor.

After almost one year of further study and work to address the additional comments received on the draft EIS, the DHPT submitted advance copies of the FEIS—which recommended Route F'—to the FHWA for comment.[8] The FEIS was revised to satisfy various concerns raised by the FHWA and Carrollton homeowners. In particular, the FEIS modified the proposed design of Route F' through part of the Carrollton area. The FEIS was thereafter approved by the Texas Highway and Public Transportation Commission and delivered to the FHWA. Following final circulation, the FHWA gave its approval in January 1984.

A number of citizens formed HAVEN in order to raise money for a possible legal challenge to SH 190. HAVEN's president and its lawyer indicated publicly that, if SH 190 were approved, litigation would ensue. HAVEN's newsletters also made clear its intent to pursue litigation.[9]

The FEIS was submitted to the EPA, which published a notice of availability in the *Federal Register* on February 10, 1984. During the following 30–day comment period, the FHWA received four responses. Three were related to complaints about the route of SH 190 through Carrollton. The

fourth was from the EPA, approving the FEIS. The FHWA and the DHPT considered each of these letters. The agencies concluded that no new significant issues had been raised and that the concerns reflected had been addressed in the FEIS process.[10] Thereafter, the final record of decision was approved, clearing SH 190 for advancement and ultimate construction pursuant to FHWA procedures and guidelines.

On March 12, 1984, one day after the 30–day comment period expired, Collin County filed the instant declaratory judgment and injunction action. *HAVEN I*, 654 F.Supp. at 947. HAVEN responded with a counterclaim, alleging that Collin County and its County Judge and Commissioners had violated HAVEN's civil rights by filing suit. *Id.* at 947–48. The court dismissed the counterclaim when HAVEN failed to replead in order to correct the deficiencies found by the court. *See id.* at 954.[11]

■ Collin and Denton Counties and the cities of Dallas, Garland, Plano, Richardson, and Carrollton, Texas, now move for summary judgment, contending that the FEIS is sufficient as a matter of law. HAVEN also moves for summary judgment, asserting that the instant declaratory judgment action is improper because plaintiffs have neither standing nor a cause of action upon which relief can be granted. HAVEN

---

**8.** At this time the primary unresolved issue was the treatment of the McKamy House, a three-story Queen Anne Victorian residence, and related outbuildings. The McKamy House was not threatened by any of the routes, although some of the outbuildings fell within the proposed alignment of Route F'.

In June 1982, the DHPT requested that the THC determine the eligibility of the McKamy House for inclusion in the *National Register of Historic Places*. In March 1983, the DHPT renewed its request for the THC's views on the McKamy property. The FHWA also noted the need for the FEIS to discuss the McKamy property. After five months, the DOI determined that the McKamy House was eligible for inclusion in the *National Register of Historic Places* but that the outbuildings were not.

The DHPT then asked the THC if SH 190 would have an effect on the McKamy House pursuant to § 4(f). The THC determined that there would be an effect but that there were "no feasible and prudent alternatives that could avoid or satisfactorily mitigate the indirect ad-

verse effects on the property." Further concluding that it was in the public interest to proceed with the project, the THC directed that a memorandum of agreement be prepared to reflect this determination. It was prepared and executed on September 30, 1983 and incorporated into the FEIS.

**9.** *See* discussion *infra* at § II(A) where the court quotes the text of several HAVEN newsletters.

**10.** A fifth letter was received after the comment period from a Carrollton City Council member. The letter generally supported the F' route.

**11.** In *HAVEN I* the court criticized the quality of HAVEN's pleadings. *See, e.g.,* 654 F.Supp. at 946 n. 3. HAVEN thereafter retained new counsel upon the death of their former attorney. Although, as the court discusses *infra,* HAVEN's summary judgment evidence is substantively inadequate, the briefs submitted by HAVEN's present counsel in connection with the instant motions are thorough and well-prepared.

also alleges that Collin County's action should be dismissed because its Commissioners' Court authorized the filing of suit in an executive session of which it failed to give notice in the detail required by the Texas Open Meetings Act, TEX.REV.CIV. STAT.ANN. art. 6252–17 (Vernon Supp. 1989).[12] HAVEN contends finally that, if a declaratory judgment action can be legally maintained, the court should in its discretion decline to entertain the action. The federal defendants—Federal Highway Administrator Robert E. Farris, Regional Highway Administrator Wesley S. Mendenhall, Jr., and Federal Highway Administration Division Administrator John J. Conrado—agree with plaintiffs that the FEIS is sufficient. They take no position with respect to whether a declaratory judgment action is proper. The Texas DHPT agrees with virtually all of plaintiffs' motion except the proposition that declaratory relief may be appropriately awarded under federal law. As to this allegation, the DHPT takes no position.

## II.

The court considers first HAVEN's contentions that plaintiffs have failed to state a claim upon which relief can be granted and that plaintiffs lack standing to bring the present action. As these arguments pertain to the present suit, both challenge, at least in part, the court's subject matter jurisdiction.[13] The court will accordingly address them both in substantive and jurisdictional contexts.

## A.

HAVEN argues that plaintiffs cannot state a claim upon which relief can be granted because the Federal Declaratory Judgment Act ("Declaratory Judgment Act"), 28 U.S.C. § 2201 *et seq.*, does not create a cause of action but only enlarges the range of remedies available to successful litigants. HAVEN posits that NEPA does not provide plaintiffs a cause of action because the statute does not confer a private right of action. HAVEN also asserts that plaintiffs cannot state a claim based upon the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, because they have been neither adversely affected nor aggrieved by an agency action within the meaning of the APA. Finally, HAVEN

---

**12.** HAVEN's contention that Collin County violated the Texas Open Meetings Act is correct. The Act is intended to safeguard the public's interest in knowing the workings of its governmental bodies. Compliance with the Act is mandatory. Action taken by a governmental body in violation of the Act is subject to judicial invalidation. *City of Bells v. Greater Texoma Utility Authority,* 744 S.W.2d 636, 640 (Tex.App. 1987, no writ) (on rehearing).

The Collin County Commissioners' Court authorized this lawsuit at a regularly scheduled meeting, following an executive session. The Commissioners' Court was required by the Act to post notice of, and to conduct, the meeting pursuant to certain statutory minimums. *Id.* The notice read:

*9:00 A.M.*—Executive Session

1. The Court will meet in Executive Session in accordance with Article 6252–17, Section 2 (e & g), V.T.C.S. (legal and personnel).

*10:00 A.M.*—Open Session—for consideration of the following matters

2. Legal matters resulting from the Executive Session.

The Texas Supreme Court has recently held that generic labels, such as "litigation," do not constitute full disclosure and do not substantially comply with the Act's requirements. *Cox*

*Enterprises, Inc. v. Board of Trustees of the Austin Independent School District,* 706 S.W.2d 956, 959 (Tex.1986) (school board could not lawfully discuss major desegregation lawsuit during executive session when notice described generalized topic of "litigation"). The notice that Collin County gave was insufficient under the holding in *Cox Enterprises.*

Nevertheless, the court need not grant HAVEN's summary judgment motion on this basis. HAVEN concedes that Collin County may ratify its action at a properly noticed and convened meeting. HAVEN argues that the refiling of the action "is a low-probability event, given today's heightened awareness of [Fed.R.Civ.P. 11]." Because Collin County makes plain in its summary judgment response that it will ratify the authorization to proceed with this litigation, there is no reason to dismiss Collin County unless, within 30 days of the date this memorandum opinion and order is filed, Collin County fails to ratify its action. The court assumes that ratification will be forthcoming and therefore denies HAVEN's summary judgment motion. Moreover, there are six other parties-plaintiff, none of which is alleged to be acting in violation of the Act.

**13.** HAVEN includes these arguments under the rubric "The Jurisdictional Defenses."

contends that plaintiffs cannot state a claim by relying upon a cause of action that HAVEN might bring in the future because HAVEN's lawsuit would be filed against the FHWA, not against the plaintiffs.[14]

Plaintiffs do not assert that they have a private right of action under NEPA or a right to obtain relief pursuant to the APA. They likewise concede that the Declaratory Judgment Act accords them a remedy, not a cause of action. Plaintiffs contend, however, that the Declaratory Judgment Act confers upon them a right to obtain relief in this court, and vests this court with subject matter jurisdiction, because HAVEN has threatened an action that would state a federal question claim.[15]

This is not the first civil action in which a party has requested that a federal court declare that an FEIS complies with NEPA. *See, e.g., Johnston v. Davis,* 698 F.2d 1088 (10th Cir.1983) (counterclaim for declaratory relief). It appears to be the first reported decision, however, in which the parties seeking a judgment declaring the sufficiency of the FEIS are not agencies required by NEPA to prepare the statement.

■ When a declaratory judgment plaintiff asserts a claim that is in the nature of a defense to a threatened action, the character of the threatened action determines whether a federal court has jurisdiction over the controversy. *Public Service Comm'n of Utah v. Wycoff Co., Inc.,* 344 U.S. 237, 248, 73 S.Ct. 236, 242, 97 L.Ed. 291 (1952); *see also Franchise Tax Board of California v. Construction Laborers Vacation Trust for Southern California,* 463 U.S. 1, 19, 103 S.Ct. 2841, 2851, 77 L.Ed.2d 420 (1983) ("[f]ederal courts have regularly taken original jurisdiction over declaratory judgment suits in which, if the

declaratory judgment defendant brought a coercive action to enforce its rights, that suit would necessarily present a federal question"). If the defendant to a declaratory judgment action could have brought a coercive action in federal court to enforce its rights, jurisdiction exists for declaratory relief. *Janakes v. United States Postal Service,* 768 F.2d 1091, 1093 (9th Cir.1985).

The Eleventh Circuit, in *Gulf States Paper Corp. v. Ingram,* 811 F.2d 1464 (11th Cir.1987), has identified three layers of complexity encountered when determining whether a declaratory judgment action invokes the district court's federal question jurisdiction: the first involves ascertaining whether a case "arises under" the laws of the United States; the second pertains to the application of the well-pleaded complaint rule; the third involves interpreting the Declaratory Judgment Act itself. *Id.* at 1466–67. To decide the existence of subject matter jurisdiction in the present case, and to determine as well whether plaintiffs have stated a claim upon which relief can be granted, the court will consider these elements in reverse order.

■ The parties agree that the Declaratory Judgment Act does not itself confer federal jurisdiction, but instead provides an additional remedy. *See Skelly Oil Co. v. Phillips Petroleum Co.,* 339 U.S. 667, 671, 70 S.Ct. 876, 878, 94 L.Ed. 1194 (1950). The Act "does allow parties to precipitate suits that otherwise might need to wait for the declaratory relief defendant to bring a coercive action." *Gulf States Paper Corp.,* 811 F.2d at 1467. The Fifth Circuit has held that the Act "operates procedurally to broaden the class of litigants who might bring into federal court causes of

14. HAVEN does argue (First MSJ Br. at 21 n. 11) that, if it sued the FHWA to enforce NEPA, it could join as a defendant the Texas DHPT because that agency actually prepared the FEIS and would be the applicant for federal-aid highway projects cost reimbursement. HAVEN asserts that it could not join the plaintiffs as parties-defendants, but concedes that the City of Carrollton, "through whose corporate boundaries the disputed portion of SH 190 passes," could conceivably be made an "ancillary" or "pendent" party "on the theory that the City of Carrollton would otherwise act to frustrate the

Court's judgment, if any, against FHWA and [DHPT]." *Id.* HAVEN does state, as well, that it is "aware of no evidence supporting such untoward speculation about City of Carrollton's behavior." *Id.*

15. There is no allegation that this court has subject matter jurisdiction based upon diversity of citizenship. Accordingly, the court addresses the jurisdictional and substantive questions presented only in the federal question context.

action arising under federal law." *Lowe v. Ingalls Shipbuilding, A Division of Litton Systems, Inc.,* 723 F.2d 1173, 1179 (5th Cir.1984). The Act does this by "enabl[ing] a party to achieve federal question jurisdiction over a suit to declare that a claim arising under federal law which another asserts against him is not valid." *Id.* (citing *Superior Oil Co. v. Pioneer Corp.,* 706 F.2d 603, 607 (5th Cir.1983), *cert. denied,* 464 U.S. 1041, 104 S.Ct. 706, 79 L.Ed.2d 171 (1984)). Accordingly, "[t]hough the underlying cause of action which is thus actually litigated is the declaratory defendant's, not the declaratory plaintiff's, this does not violate the requirement that what must arise under federal law is the cause of action in issue itself (regardless of to whom it belongs) as distinguished from some defense to it." *Id.* What is litigated is " 'the precise issue which could have been litigated in federal court in a coercive action brought by' the declaratory defendant." *Id.* (quoting 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2767 (Rev. ed. 1983)). The declaratory judgment plaintiff's federal claim cannot, of course, arise only as a defense to a state created action. *Franchise Tax Board,* 463 U.S. at 16, 103 S.Ct. at 2849; *Lowe,* 723 F.2d at 1180. But if a declaratory judgment plaintiff seeks judgment that a defendant does not have a claim that arises under federal law, jurisdiction is present. *See Lowe,* 723 F.2d at 1181. The declaratory judgment device allows a party to bootstrap its way into federal court by bringing a federal suit that corresponds to the one the opposing party might have brought. *Gulf States Paper Corp.,* 811 F.2d at 1467 (citing *Superior Oil,* 706 F.2d at 607).

■■■ The second layer of inquiry arises in connection with the well-pleaded complaint rule. To invoke federal jurisdiction, the complaint's well-pleaded allegations must raise a substantial issue of federal law. *Franchise Tax Board,* 463 U.S. at 10–11, 103 S.Ct. at 2846–2847. If the federal question only appears as an anticipated defense, the complaint is not well-pleaded. *Id.* As applied in the declaratory judgment context, the rule is satisfied if the federal issue presented in the declaratory judgment action "would inhere in the claim on the face of the complaint that would have been presented in a traditional damage or coercive action." *McDougald v. Jenson,* 786 F.2d 1465, 1476 (11th Cir.) (quoting 10A Wright, Miller & Kane § 2767), *cert. denied,* 479 U.S. 860, 107 S.Ct. 207, 93 L.Ed.2d 137 (1986). To apply the well-pleaded complaint rule, the court disregards the availability of declaratory relief and analyzes the assumed coercive action by the declaratory judgment defendant. *Gulf States Paper Corp.,* 811 F.2d at 1467. The court determines whether any hypothetical coercive suit by the declaratory judgment defendant would necessarily present a federal question. *Mobil Oil Corp. v. City of Long Beach,* 772 F.2d 534, 539–40 (9th Cir.1985).

■■ The third area of analysis is the existence *vel non* of a federal question in the identified coercive action. 28 U.S.C. § 1331 extends original jurisdiction to the federal courts in all civil actions "arising under the Constitution, laws or treaties of the United States." HAVEN does not question that, if it brought an action under the APA to challenge the adequacy of the FEIS, the action would be coercive and would state a federal question.[16] It likewise does not question that plaintiffs' declaratory judgment complaint identifies a federal claim that HAVEN would prosecute as opposed to a state claim or a federal defense to a state claim. HAVEN contends that the Declaratory Judgment Act is not satisfied because the summary judgment record establishes neither that HAVEN will bring such a coercive action nor that HAVEN will name as defendants any of the plaintiffs to the instant suit. The court finds no difficulty rejecting both propositions.

The summary judgment record demonstrates that HAVEN was formed as a legal action committee and that it has threatened

---

**16.** HAVEN concedes that it has a right to seek judicial review of the FEIS pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq. See also supra* note 14.

suit on many occasions. HAVEN's first newsletter states:

> The intent of Carrollton "H.A.V.E.N." Inc., is to create a legal defense fund through voluntary contributions of affected homeowners, private citizens, and business interests to prevent this freeway from being built in the Trinity Mills corridor.

The first newsletter also contains this advice to HAVEN members:

> Issues of this type have been successfully challenged before in courts. State Highway Departments have a poor track record in this area. Their job is building highways, not testifying in court.

> Suits of this type are long and drawn out. Some roads have gotten tied up in court for as much as a decade. We should be prepared for a war instead of a battle when entering one of these situations. And we should be prepared to encounter legal fees, witness fees, and special studies which can run into the hundreds of thousands of dollars.

On January 25, 1984, less than eight days after HAVEN filed its corporate charter, a newspaper article quoted its representative as stating:

> Essentially you can expect some litigation coming.... It will be privately funded and financed.

Another HAVEN member was quoted in a newspaper as follows:

> Our desire is to tie-up the case in court so that the state highway department will be forced to look at our alternate route.

HAVEN's former attorney, the late Walter Cober, Esq., sent a letter to the FHWA, making clear HAVEN's position:

> I have been authorized to inform you that this group is prepared to challenge you in court....

In a March 1986 HAVEN newsletter, a HAVEN member reported:

> Walter Cober, our attorney, began research for the lawsuit during the last week of February. He estimates this research will take approximately 60 days to complete. Actual preparation of the suit will take an additional 30 days. We are expecting to file the suit sometime in early May or early June.

In fact, HAVEN did not file suit. As HAVEN's June 1986 newsletter explained:

> Walter Cober advised [HAVEN's legal] committee that delaying the lawsuit for 12–18 months would strengthen HAVEN's legal position and increase the chances for a negotiated settlement.

This tack is also reflected in HAVEN's January 12, 1987 newsletter:

> We are not trying to hurry this lawsuit along because time is our ally and time is the cheapest option we have right now.

Notwithstanding that HAVEN has yet to file suit on the merits of the FEIS, the summary judgment record reflects with adequate clarity that HAVEN fully contemplated filing suit and that, still today, litigation regarding the FEIS is sufficiently threatened.

 The court likewise rejects HAVEN's contention that plaintiffs do not have a right to relief because HAVEN would not file a coercive action against the plaintiffs to this suit. This proposition confuses subject matter jurisdiction with the availability of a declaratory judgment remedy and paints an unduly narrow picture of the reach of the Act.

HAVEN essentially argues that, if a defendant's federal question action would not be brought against the declaratory judgment plaintiff, the plaintiff cannot maintain an action under the Act. The court has located no reported decisions that construe the Declaratory Judgment Act so narrowly.[17] While it is true that the court must

---

**17.** HAVEN likewise cites no such decision in its briefing, although it argues that *Wade v. Goldschmidt*, 673 F.2d 182 (7th Cir.1982) (per curiam), supports the proposition that the political subdivision plaintiffs would not have the right to party status in a coercive action filed by HAVEN against either the FHWA alone, or against the FHWA and the Texas DHPT.

In *Wade* the plaintiffs sued the U.S. Department of Transportation ("DOT"), alleging that its action relating to the construction of an expressway and bridge exceeded DOT's authority. The State of Illinois intervened as a defen-

examine the hypothetical coercive action of the declaratory judgment defendant for the presence of a federal question, that inquiry ends with the determination that the court has subject matter jurisdiction. *See, e.g., McDougald*, 786 F.2d at 1476–80 & 1480–81 (discussing separately the questions of subject matter jurisdiction and the availability of a declaratory remedy). The universe of plaintiffs who may prosecute a declaratory judgment action is cabined, instead, by traditional principles of standing and ripeness, none of which measures explicitly whether the plaintiff would be a defendant to the declaratory judgment defendant's coercive action. The court turns to these standards to determine whether the plaintiffs may prosecute this case.

■ To sustain a declaratory judgment action: first, the plaintiff must allege facts indicating that there is a substantial controversy between parties [18] who have adverse legal interests of sufficient immediacy and reality, *Middle South Energy, Inc. v. City of New Orleans*, 800 F.2d 488, 490 (5th Cir.1986); second, there must be an actual controversy, which must exist at the time the court acts upon the complaint for declaratory relief, *Golden v. Zwickler*, 394 U.S. 103, 110, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969); and third, the plaintiff must have standing, that is, a personal stake in the outcome of the case, evidenced by a distinct and palpable injury to itself, *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). While it is not possible to fashion a "precise test" to determine the adequacy of a particular contest, the court must look for controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

■ The summary judgment record affirmatively demonstrates a substantial controversy between parties who have adverse legal interests of sufficient immediacy and reality. Both prior to the filing of suit and at present, plaintiffs contend the FEIS in question is sufficient and that SH 190 should be constructed along the route planned; HAVEN, on the other hand, opposes a portion of SH 190 [19] and asserts that the FEIS does not comply with the requirements of NEPA. The controversy has not abated,[20] and it remains as of the

---

dant. 673 F.2d at 183 & n. 1. Plaintiffs amended their complaint to contend, *inter alia*, that a proper EIS was not prepared, thus violating NEPA. *Id.* at 183–84. Several parties, including various Illinois political subdivisions, sought to intervene and the district declined to permit intervention. *Id.* at 184 & n. 2.

The *Wade* court affirmed the district court's decision, holding in part that, "In a suit such as this, brought to require compliance with federal statutes regulating governmental projects, the governmental bodies charged with compliance can be the only defendants. As to the determination involved in this suit, all other entities have no right to intervene as defendants." *Id.* at 185.

Even if *Wade* applies in the declaratory judgment context—a proposition this court need not decide—HAVEN incorrectly assumes its applicability to the instant facts. *Wade* holds that "the governmental bodies charged with compliance can be the only defendants" in a suit "brought to require compliance with federal statutes regulating governmental projects." *Id.* The summary judgment record establishes HAVEN's intent not merely to "require compliance with federal statutes" but also to tie up the SH 190 project in court. This genre of lawsuit does not include as defendants only the governmental bodies charged with compliance. *See, e.g., Residents in*

*Protest—I–35E v. Dole*, 583 F.Supp. 653 (D.Minn. 1984), and *Falls Road Impact Committee, Inc. v. Dole*, 581 F.Supp. 678 (E.D.Wis.), *aff'd*, 737 F.2d 1476 (7th Cir.1984), both of which involved proposed highway construction in which non-profit organizations sued at least one political subdivision defendant.

**18.** The requirement that there be an "actual controversy between parties" does not suggest the validity of HAVEN's position. This test refers to the requirement that there "be a real and substantial controversy admitting of specific relief through a decree of conclusive character as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937).

**19.** HAVEN contends, and plaintiffs do not dispute, that HAVEN "does not now have nor has it ever had any quarrel with the segment of SH 190 within the jurisdiction of ... Collin County." (D. Resp. Ps. MSJ at 5).

**20.** The court does not suggest that the existence of a present controversy may be proven solely by the fact that the parties are now involved in litigation. This would permit a party to satisfy the present controversy element merely by fil-

date this court is called upon to enter declaratory judgment. For reasons the court explains *infra* in connection with the issue of standing, plaintiffs have demonstrated that they have a stake in the outcome of this case, evidenced by a distinct and palpable threat of injury.

### B.

■ The court likewise rejects HAVEN's contention that plaintiffs lack standing. To demonstrate standing, a party must show: (1) actual or threatened injury to a legally cognizable interest; (2) that the injury is fairly traceable to the challenged action; and (3) that the injury is reasonably susceptible of successful redress by the court. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982).

It is clear from the summary judgment record that plaintiffs would be injured by a major delay in, or the halting of, construction of SH 190. Local governments that have expended resources on a project can be harmed by attempts to interfere with efforts necessary to bring the project to completion. Moreover, a declaratory judgment, if granted, would declare the FEIS sufficient as a matter of law, thereby ending the possibility of future litigation on the adequacy of the FEIS as of the date it was issued.[21]

■ Because there is a threatened harm to the plaintiffs that directly emanates from HAVEN's activities, and be-

cause declaratory relief could legally end the controversy, plaintiffs clearly have standing to bring suit.[22]

### C.

■ This court retains the discretion to decline to enter a declaratory judgment even when it possesses subject matter jurisdiction and the party seeking relief has satisfied the requirements for obtaining such a judgment. *Navistar International Corp. v. Emery*, 643 F.Supp. 515, 517 (N.D. Tex.1986) (Porter, J.) (whether court decides to issue declaratory judgment is a matter of judicial discretion). This discretion is not unbridled, and must be exercised after a full inquiry into all the relevant considerations. *Allstate Insurance Co. v. Green*, 825 F.2d 1061, 1065 (6th Cir.1987).

■ To decide whether a civil action is suitable for declaratory judgment, a court will examine factors such as whether the action would serve a useful purpose in clarifying legal relations at issue, whether the remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race to res judicata, whether the use of declaratory judgment would increase friction between state and federal courts and improperly encroach on state jurisdiction, and whether there is an alternative remedy that is better or more effective. *Manley, Bennett, McDonald & Co. v. St. Paul Fire & Marine Insurance Co.*, 791 F.2d 460, 462 (6th Cir.1986). HAVEN contends the court should decline to exercise jurisdiction because there is an "ex-

---

ing suit, and thus bootstrap itself into a right to proceed that would not otherwise exist.

**21.** The court does not disregard the possibility that the FHWA may be required to supplement the FEIS under some circumstances. *See generally infra* § III(B)(5). As the court explains, however, HAVEN does not now contend that the FEIS—as opposed to the draft EIS—should be supplemented or recirculated.

**22.** The court similarly concludes that the action presents a ripe controversy. The doctrine of ripeness is intended "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been for-

malized and its effects felt in a concrete way by the challenging parties." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 1515–16, 18 L.Ed.2d 681 (1967). Judicial review of agency compliance with NEPA regulations should not occur before the agency has filed the FEIS or has made a final finding of "no significant impact" or takes action that will result in irreparable injury. 40 C.F.R. § 1500.3 (1988). This action is considered ripe with no more administrative remedies to exhaust because the FHWA has issued a clear and final EIS. *Oregon Environmental Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir.1987); *see also Trustees for Alaska v. Hodel*, 806 F.2d 1378, 1381 (9th Cir. 1986).

treme mismatch of financial resources" between HAVEN and the political subdivision plaintiffs; no other defendant plans actively to fund or participate in HAVEN's defense of this action; the issue of the alignment of SH 190 is a political dispute of long standing; the federal defendants have twice refused to realign as plaintiffs in this action; the action is very complex procedurally; and the issue to be decided is too speculative.

■ The court concludes that it should exercise its discretion to consider the present action. Declaratory judgments are frequently entered to resolve environmental litigation and, particularly, to determine whether an environmental impact statement has been prepared in compliance with NEPA. *See, e.g., Save the Niobrara River Ass'n, Inc. v. Andrus,* 483 F.Supp. 844, 863 (D.Neb.1977). The instant lawsuit will clarify whether the FEIS for SH 190 is sufficient in whole or in part, will not trammel upon state court jurisdiction, and is an expedient means to resolve a question, the determination of which will affect a major public works undertaking. The court can discern no better or more effective remedy available to the interested parties.[23]

The court also rejects HAVEN's contention that the issue to be decided is too speculative. HAVEN argues that there is uncertainty whether SH 190 will be built due to "many administrative and political barriers to construction." HAVEN also asserts that this lawsuit adversely impacts "on the ability of citizens to pursue legitimate avenues for protection of their interests." Contrary to HAVEN's argument, the question whether an EIS is sufficient is a tightly framed issue. Moreover, HAVEN has presented no evidence that indicates the highway will not be built; indeed, HAVEN's evidence merely demonstrates that there is much to be done before SH 190 will be completed. Assuming there are admin-

istrative and political barriers to the commencement of construction, these obstacles need not interfere with this court's determination that the FEIS is sufficient. Once an actual controversy has been shown, as it has here, the fact that there are contingencies should not induce this court to decline to rule. *See Browning–Ferris Industries of Alabama, Inc. v. Alabama Dept. of Environmental Management,* 799 F.2d 1473, 1478–79 (11th Cir.1986) (citing 10A Wright, Miller & Kane § 2757 (declaratory judgment can be proper even though there are future contingencies that will determine whether controversy actually becomes real)). This court's determination as to the adequacy of the FEIS will not interfere or encumber the other aspects of the development of the highway; a judicial declaration on the FEIS will simply clarify one discrete aspect of the process.

### III.

The court now turns to the merits of plaintiffs' motion for summary judgment. This motion presents the question whether there is a genuine issue that the FEIS is insufficient.

### A.

As part of NEPA's broad national commitment to protecting and promoting environmental quality, *see* 42 U.S.C. § 4331, the Act requires that "all agencies of the Federal Government shall ... include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on ... the environmental impact of the proposed action[.]" 42 U.S.C. § 4332(2)(C)(i). Just this Term, the Supreme Court, in *Robertson v. Methow Valley Citizens Council,* —— U.S. ——, 109 S.Ct. 1835, 1845, 104 L.Ed.2d 351 (1989), reiterated two important respects in

---

**23.** The court raised at oral argument the troublesome prospect of a publicly-funded political subdivision effectively pretermitting a reasoned evaluation of an EIS by targeting a weak EIS opponent as a declaratory judgment defendant. (*See* Tr. Oral Arg. at 51–52). The court has no such concern in the present case. HAVEN has

actively litigated this action. Notwithstanding an ill-advised counterclaim, *cf. HAVEN I,* HAVEN has presented cogent opposition to the FEIS that certainly does not reflect in analytical substance any pecuniary imbalance between plaintiffs on the one hand and HAVEN on the other.

which an environmental impact statement serves NEPA's "action-forcing"[24] purpose: first, it "ensures that the agency, in reaching its decision, will have available and will carefully consider detailed information concerning significant environmental impacts;" second, "it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." Moreover, "[p]ublication of an EIS, both in draft and final form, also serves a larger informational role. It gives the public the assurance that the agency 'has indeed considered environmental concerns in its decisionmaking process.'" *Id.* (quoting *Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 97, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983)).

The action-forcing procedures of NEPA require that agencies take a "hard look" at environmental consequences. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976). "Although these procedures are almost certain to affect the agency's substantive decision, it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson*, 109 S.Ct. at 1846 (citing *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227–228, 100 S.Ct. 497, 499–500, 62 L.Ed.2d 433 (1980) (per curiam); *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978)). "If the adverse environmental effects of

the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Id.* NEPA is essentially a procedural statute designed to ensure that environmental issues are given proper consideration in the decisionmaking process. *Trustees for Alaska v. Hodel*, 806 F.2d 1378, 1382 (9th Cir.1986).

To comply with the requirements of NEPA, an agency must examine five subjects in its EIS.[25] An agency must also prepare a draft EIS and request comments from state and local agencies, and the public, and affirmatively solicit comments from interested or affected persons and organizations. 40 C.F.R. § 1503.1 (1988). In preparing a final EIS, an agency must consider and respond to comments. 40 C.F.R. § 1503.4 (1988).

■ The district court's review of an EIS is principally governed by the APA, which provides that agency action may be set aside if undertaken "without observance of procedure required by law." *Oregon Environmental Council v. Kunzman*, 817 F.2d 484, 492 (9th Cir.1987) (quoting *Enos v. Marsh*, 769 F.2d 1363, 1372 (9th Cir.1985)). The reviewing court is concerned with procedure over substance and, as a result, the role of a court "in reviewing a disputed EIS is strictly limited." *Isle of Hope Historical Ass'n, Inc. v. U.S. Army Corps of Engineers*, 646 F.2d 215, 220 (5th Cir. Unit B 1981) (per curiam) (adopting district court opinion). If the adverse environmental effects of the pro-

---

24. "The term 'action forcing' was introduced during the Senate's consideration of NEPA, and refers to the notion that preparation of an EIS ensures that the environmental goals set out in NEPA are 'infused into the ongoing programs and actions of the Federal Government.'" *Marsh v. Oregon Natural Resources Council*, —— U.S. ——, 109 S.Ct. 1851, 1858 n. 14, 104 L.Ed.2d 377 (1989) (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 409 n. 18, 96 S.Ct. 2718, 2730 n. 18, 49 L.Ed.2d 576 (1976) and quoting 115 Cong.Rec. 40416 (1969) (remarks of Sen. Jackson)) (citations omitted).

25. 42 U.S.C. § 4332(2)(C) provides for a detailed statement on:

(i) the environmental impact of the proposed action,
(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
(iii) alternatives to the proposed action,
(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

posed action are adequately identified and evaluated, the court is not to second-guess the agency's substantive determination. *See Robertson*, 109 S.Ct. at 1846.

The Fifth Circuit has adopted three criteria for determining the adequacy of an EIS: (1) whether the agency in good faith has objectively taken a hard look at the environmental consequences of a proposed action and alternatives; (2) whether the EIS provides detail sufficient to allow those who did not participate in its preparation to understand and consider the pertinent environmental influences involved; and (3) whether the EIS explanation of alternatives is sufficient to permit a reasoned choice among different courses of action. *Isle of Hope*, 646 F.2d at 220 (citing *Save Our Sycamore v. Metropolitan Atlanta Rapid Transit Authority*, 576 F.2d 573 (5th Cir.1978) (per curiam)). The second and third factors are "subsidiary determinations." *Save Our Sycamore*, 576 F.2d at 575. These formulations "express an aggregate of factors implicit in the decision whether a 'hard look' has been taken 'in good faith objectivity.' " *Id.* Thus, the standard for judging the sufficiency of an FEIS in the Fifth Circuit is simply a "rule of reason." *Isle of Hope*, 646 F.2d at 220 (citing *Sierra Club v. Morton*, 510 F.2d 813, 819 (5th Cir.1975)). "[T]he Court is to follow a pragmatic standard which requires good faith objectivity but avoids 'fly specking.' " *Id.* (quoting *Lathan v. Brineger*, 506 F.2d 677, 693 (9th Cir.1974)); *see also Association Concerned About Tomorrow, Inc. v. Dole*, 610 F.Supp. 1101, 1107 (N.D.

Tex.1985) (Sanders, J.) *(courts must not "fly speck" an EIS)*. It is clear that the district court is not to concern itself with the merits of the agency's decision; the focus instead is upon the integrity of the NEPA–EIS process used to make that decision. *Sierra Club v. Sigler*, 695 F.2d 957, 965 (5th Cir.1983); *see Robertson*, 109 S.Ct. at 1846 ("NEPA itself *does* not mandate particular results, but simply prescribes the necessary process").

### B.

The court now determines whether HAVEN has presented at least a fact issue that the FEIS is insufficient.[26]

When the parties that do not have the burden of proof on an issue move for summary judgment, they are required only to point the district court to the absence of evidence to support the claims of the party with the proof burden. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); *Slaughter v. Allstate Insurance Co.*, 803 F.2d 857, 860 (5th Cir.1986); *see Int'l Ass'n of Machinists & Aerospace Workers, AFL–CIO, Lodge No. 2504 v. Intercontinental Mfg. Co.*, 812 F.2d 219, 222 (5th Cir.1987) (party moving for summary judgment can rely on absence of evidence to support essential element of opponent's case). In the present case, plaintiffs' summary judgment motion adequately directs the court's attention to the absence of such evidence. The burden has therefore shifted to HAVEN to adduce evidence which, if believed by the

---

26. The summary judgment issue is so framed because the burden of proving by a preponderance of the evidence that an FEIS is insufficient is upon the party that challenges its validity. *Isle of Hope Historical Ass'n, Inc. v. U.S. Army Corps of Engineers*, 646 F.2d 215, 220 (5th Cir. Unit B 1981) (per curiam) (adopting district court opinion). Plaintiffs contend that HAVEN bears the burden because HAVEN contests the sufficiency of the FEIS. *See Sierra Club v. Froehlke*, 816 F.2d 205, 213 (5th Cir.1987). HAVEN responds that plaintiffs bear the burden because they seek a declaratory judgment that the FEIS is sufficient.

The court examines the substantive questions presented in order properly to place the burden of proof, despite the fact that this is a declaratory judgment action. *Reasor v. City of Norfolk*,

606 F.Supp. 788, 793 (E.D.Va.1984). In a case involving a question of the sufficiency of an FEIS, it is the party seeking to invalidate the EIS that has the burden of persuasion. *Texas Committee on Natural Resources v. Marsh*, 736 F.2d 262, 270, *modified*, 741 F.2d 823 (5th Cir. 1984). Thus, HAVEN, as the party seeking invalidation, bears the burden, even in a declaratory judgment action, because the underlying case involves the propriety of the FEIS. *Reasor*, 606 F.Supp. at 793; *see also Pacific Portland Cement Co. v. Food Machinery & Chemical Corp.*, 178 F.2d 541, 546 (9th Cir.1949) (in declaratory judgment case, the question of who has the burden is determined not so much by the position of the parties, nor by choosing who is the actor in the lawsuit, as by the nature of the relief asked for and granted).

trier of fact, would entitle it to relief. *Putnam v. Insurance Co. of North America*, 673 F.Supp. 171, 175 (N.D.Miss.1987), *aff'd*, 845 F.2d 1020 (5th Cir.1988).

HAVEN argues that the FEIS is insufficient in five respects: [27] air quality impacts; water quality and flooding impacts; prejudgment of SH 190 alternatives; § 4(f) assessment; and the decision to depress SH 190 through Carrollton. The court addresses each of these in turn.

–1–

■ HAVEN contends that the air quality report in the FEIS does not meet the second prong of the *Isle of Hope* test: that is, it does not provide detail sufficient to allow those who did not participate in its preparation to understand and consider the pertinent environmental influences involved. Because the second prong is more appropriately treated as a subsidiary determination whether the FHWA took a "hard look" in "good faith objectivity," *Save Our Sycamore*, 576 F.2d at 575, the court will not independently determine whether the second prong has been met. The court will examine instead the overall documentation to see if the FEIS comports with the requirements of NEPA.

HAVEN argues that the air quality control summary is deceptive because the FEIS did not analyze the difference in air quality in the elevated and depressed sections of SH 190. The summary judgment evidence demonstrates, however, that the FEIS considered the impact on air quality

of Routes G and J and the depressed portions of Route F'. (Arredondo Aff. at 3). The air quality report analyzed carbon monoxide concentrations using an emissions model, Mobile 2, and a California dispersion model, Caline 3,[28] both of which were current emission and dispersion models, *id.*, and compared both the depressed and elevated typical business sections of F'. *See* FEIS at 61. Thus, this court cannot find that the FEIS is insufficient based on this alleged failure of analysis.

Simply because the court determines that HAVEN's complaints about the air quality report are not borne out by the summary judgment evidence, however, does not fulfill the court's duty in examining the report. Indeed, in order to find the FEIS sufficient the court must determine that the agencies took a hard look, in good faith objectivity, at the environmental impact. Examining air quality is no exception. The 120–page study on air quality which is summarized in the FEIS at 61, and incorporated by reference, made a painstaking and careful mathematical study of motor vehicle emissions and carbon monoxide ("CO"). It compared carbon monoxide concentrations to the National Ambient Air Quality Standards. FEIS at 61.[29] The court concludes, from the undisputed material summary judgment evidence, that the study took a hard look, in good faith objectivity, at the impact on air quality and that the conclusions and summaries are supported by the analysis contained in the study.[30]

27. HAVEN's summary judgment response states that the FEIS is inadequate in "at least" five respects. Because HAVEN has the burden of adducing evidence on all the bases on which it relies, however, the court concludes that HAVEN is limited to the grounds expressly set forth in its response.

28. The court notes, as does HAVEN, the apparent inconsistency between the air quality report, which states that carbon monoxide concentrations were calculated by Caline 2, and the Arredondo affidavit, which testifies that Caline 3 was used. Having been presented with no evidence to the contrary, the court determines that whether Caline 2 or Caline 3 was used is not a significant difference. Moreover, the court will not rule out the possibility that Caline 2 was used originally and Caline 3 was used for updates.

29. The findings of the report include:

(1) CO contributions from main lane traffic and frontage roads are no more than one part per million (ppm) anywhere along SH 190;

(2) there are no significant differences among the CO concentrations for routes F', G and J;

(3) there is no significant difference between the elevated and depressed sections of F';

(4) at no point will the one hour or eight hour standards be exceeded for any of the options; and

(5) in 1995, under the "no build" scenario, the eight hour standard will be exceeded at the right of way, but not at the typical business.

30. Anytime complicated mathematical models are used, it will necessarily be the case that "[someone] who did not participate in its preparation [might not] understand...." *Isle of*

–2–

The court next addresses whether the FEIS adequately discussed water quality and flooding impact. HAVEN contends that the FEIS fails the first and third prongs of the *Isle of Hope* test. HAVEN has submitted the affidavit of Dr. Robert J. Brandes ("Brandes"), who assessed the FEIS. He states that the FHWA and the DHPT will use adequate hydraulic design practices (Brandes Aff. at 2), but concludes that "there are real environmental consequences that should be discussed related to this engineering feat." In particular, Dr. Brandes notes that "[s]ignificant volumes of water contaminated with motor vehicle pollutants will be concentrated at one or a small number of sites by the drainage effort."

This court may not substitute— for the judgment of the agency—any concern that it may harbor about possible contamination. *Isle of Hope,* 646 F.2d at 220 (court has no warrant to substitute its own notion of how the agency should have weighed the evidence). NEPA does not require that an agency take action that is most compatible with the environment. *Sigler,* 695 F.2d at 977. Nor is it necessary for the FEIS to describe mitigation measures. *Robertson,* 109 S.Ct. at 1847. NEPA prohibits uninformed—rather than unwise—agency action. *Id.* at 1846.

HAVEN argues, of course, that the FEIS should have analyzed the effects on the environment regardless what position the FEIS actually took. But the FEIS did, in fact, adequately assess the impact on water and flooding, *see* FEIS at 19–20, and the controversy about water quality appears to be a disagreement among experts.

*Hope,* 646 F.2d at 220 (second prong of the test for determining adequacy of FEIS). Because of the complex nature of the analysis, the court cannot—and should not—require that the uninitiated understand all of the various factors considered. The court can, and in this instance does, determine that the *summary* of the data is understandable to someone who did not participate in the preparation. This interpretation of the law supports the general "rule of reason" adopted by the Fifth Circuit. *See Sierra Club v. Morton,* 510 F.2d 813, 819 (5th Cir.1975) (compliance to be judged against "rule of reason").

*See South Louisiana Environmental Council, Inc. v. Sand,* 629 F.2d 1005, 1014 (5th Cir.1980) (the court should not try to sift through controversies between experts). A divergence of viewpoints among experts does not render an impact statement inadequate. *Id.*[31]

Nor may the court declare the FEIS insufficient simply because it did not engage all the latest scientific techniques on every aspect of the FEIS. Not every conceivable scientific technique available must be employed when examining the environmental impact of a proposed project. *Sierra Club v. Froehlke,* 816 F.2d 205, 214 (5th Cir.1987). Such a standard would create exactly the kind of nitpicking courts should avoid. *Id.* The relevant inquiry is whether the agency, in objective good faith, took a "hard look" at the environmental consequences. In this case the FEIS analyzed the physical, chemical, and biological impact on water quality, as well as stream modifications and flood hazard elevation.[32]

Moreover, the FEIS indicates that "[d]etailed hydraulic studies will be conducted during the design phase of Project Development to determine the increase, if any, in water surface elevations on the affected floodways." FEIS at 21. Under FHWA regulations, detailed design work on a highway may not commence until after an FEIS has been approved and a record of decision has been signed. 23 C.F.R. § 771.113(a) (1988). Because hydrology and hydraulics are studied in detail during the design phase of project development (Thompson Aff. at 2), the court cannot conclude that the preliminary hydraulics studies make the FEIS insufficient.

**31.** HAVEN asserts that District Engineer Robert Yeilding's informal statement that he did not believe a fully depressed section of SH 190 could be drained supports a finding of inadequacy. The court declines, however, to permit the adequacy of the FEIS to be undermined by speculative remarks made prior to any formal study of the depressed portion of the highway.

**32.** Moreover, discussion of flooding need not be included in the FEIS. *Association Concerned About Tomorrow,* 610 F.Supp. at 1110.

Examining the water quality and flooding impact as a whole, the court concludes that the FEIS is sufficient in this respect.

–3–

██ HAVEN asserts that the DHPT and the FHWA impermissibly prejudged the SH 190 alternatives and that, in so doing, the NEPA process was compromised. HAVEN relies on two documents to support its theory, one of which was a record of a conversation between the DHPT and the FHWA immediately following the meeting on the draft EIS.[33] The second document is a letter, dated February 1, 1980, from the FHWA to the DHPT which suggests that "only consideration of design alternatives is warranted." (DX L) (preliminarily approving Route F, a route ultimately not selected). The court concludes that there is no fact question presented and that, as a matter of law, the FEIS is not deficient in its analysis of alternative routes.

After this alleged prejudgment, Routes G and J were studied. Similarly, the request that the DHPT consider depressing a section of SH 190 was examined in detail and ultimately adopted in the FEIS. Despite the opinions of these two individuals, new alternative routes were assessed in the FEIS and one was ultimately adopted as the proposed route. Because there is simply no basis for the prejudgment claim, the court will not declare the FEIS insufficient on this ground.

–4–

██ HAVEN contends the DHPT erred in determining that no § 4(f)[34] park and/or recreation areas are affected by Route F", the chosen route. As a preliminary matter, the court reminds HAVEN that the court's function is not to make a merits determination. The court's review is "strictly limited" and exalts procedure over substance. HAVEN argues that the error was in the failure to make a § 4(f) determination. The court is authorized to review such a failure only to the extent that it does not require a merits-based analysis.[35]

Section 4(f) reflects a Congressional intent to aggressively protect public parks and recreational lands. The lands that HAVEN contends should have been, but were not, viewed as § 4(f) property are properties located along Trinity Mills Road, between Kelly–Springfield Road on the east and Elk Grove Road on the west.[36] These properties were acquired by Dallas County from a private citizen in 1973 for a highway right-of-way. The right-of-way is being used for recreation under an agreement between the City of Carrollton and Dallas County.[37] Plaintiffs contend that a § 4(f) review was not necessary because § 4(f) is inapplicable to temporary uses of highway rights-of-way for recreational activities.

██ The court concludes, as the FEIS does, that rights-of-way transformed into temporary parks are not the kind of parks with which § 4(f) is concerned. Section 4(f) requires special study when a publicly

---

33. This conversation was recorded, as follows: "... District Engineer Robert Yeilding advised us informally that study of this project had gone on long enough...."

34. Section 4(f) is derived from § 4(f) of the Department of Transportation Act of 1966:

[T]he Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area or wildlife and waterfowl refuge of national, State, or local significance as so determined by such officials unless (1) there is no feasible and prudent alternative to the use of such land and (2) such program includes all possible planning to minimize harm to such park, recreation area, wildlife and waterfowl refuge, or historic site resulting from such use.

This section was originally codified at 49 U.S.C. § 1653(f) and subsequently recodified at 49 U.S.C. § 303, with slightly different wording.

35. The FEIS does contain a section that addresses impacts on § 4(f) properties. This portion of the FEIS details the property in question and why it is not considered § 4(f) property. *See* FEIS at 77 & Appendix B; *see also supra* note 8.

36. HAVEN does not contest the classification of the McKamy House.

37. The City of Carrollton approached Dallas County about the possibility of using the land as a "temporary park" until construction began. The County agreed to this arrangement because it would reduce its maintenance responsibilities and costs while providing interim park space for Carrollton. FEIS at 77.

owned park will be taken for, or affected by, a right-of-way for a highway. This is simply not the case here. The properties in question were acquired from a private owner by Dallas County for right-of-way purposes; they are being used temporarily as a park. Simply because the properties have an interim use does not change their character: they were purchased as rights-of-way and will be used as rights-of-way in the future. While the City of Carrollton has unlimited use of the land until construction begins, it is evident that the City never intended the properties to be, and never could have utilized them as, a City-owned recreational facility. *See Citizens Environmental Council v. Volpe*, 364 F.Supp. 286, 295 (D.Kan.) (strip land originally acquired for highway purposes but temporarily used for park not considered city park land for purposes of FEIS), *aff'd*, 484 F.2d 870 (10th Cir.1973), *cert. denied sub nom. Citizens Environmental Council v. Brinegar*, 416 U.S. 936, 94 S.Ct. 1935, 40 L.Ed.2d 286 (1974). Accordingly, the court concludes that the FHWA did not err when it stated in the FEIS that "[t]here are no Section 4(f) properties directly associated with this project along route F'." *See* FEIS at 77; *but see* FEIS Appendix B at B–8–F (demonstrating FHWA's consideration of effect of SH 190 on the McKamy House).

Such a conclusion comports with the FHWA's position on temporary use of a right-of-way. The FHWA has consistently maintained that § 4(f) does not apply to temporary use. (Rupert Aff. at 2). As the summary judgment evidence indicates, this is because

> [o]ften, actual construction of a highway project begins years after the acquisition of some right-of-way. Rather than fencing off or prohibiting the use of such land for what could be long periods of time, the State Highway Agency often *permits* the highway right-of-way to be used temporarily for non highway purposes to benefit the public. Thus, an often valuable resource is not wasted.

*Id.* (Emphasis in original). In other words, temporary use does not change the fundamental nature—in this case, land acquired for a right-of-way—of the property in question.

–5–

■ HAVEN argues, finally, that the draft EIS should have been recirculated or supplemented to provide adequate review of the depressed roadway design incorporated in the FEIS. In response to comments to the draft EIS, the FHWA incorporated a design change so that SH 190 would be constructed below grade between Old Denton Road and Kelly–Springfield Road. The purpose of the change was to provide for the abatement of noise generated by freeway traffic. *See* FEIS at 66a–66b and Appendix C. HAVEN assails the FEIS because it did not evaluate the impact of the depressed roadway design on water quality or flooding and merely stated that design of the roadway would be in accordance with highway design policies and standards. HAVEN submits in opposition to plaintiffs' summary judgment motion the Brandes affidavit, contending that, at a minimum, the affidavit creates a genuine issue of material fact whether the environmental impacts of the highway design are "significant."

After preparing a draft EIS, the responsible agency must solicit comments from other federal agencies, appropriate state and local agencies, affected Indian tribes, any relevant applicant, the public generally, and, in particular, interested or affected persons or organizations. 40 C.F.R. § 1503.1 (1987). The agency must likewise "discuss at appropriate points ... any responsible opposing view which was not adequately discussed in the draft statement and [must] indicate the agency's response to the issue raised." *Id.* § 1502.9; *see also* § 1503.4 (an agency ... shall assess and consider comments ... and shall respond in the final statements ... by (1) modifying alternatives including the proposed action ... [or] (3) supplement[ing], improv[ing] or modify[ing] its analyses ..."). In the present case the FHWA complied with the regulations in both respects. It solicited comments from all appropriate sources and it addressed in the FEIS the depressing of

a portion of SH 190 to provide a continuous "wall" to abate noise. HAVEN contends the FHWA should have recirculated or supplemented the draft EIS in light of the partial design change for Route F'.

The Supreme Court recently reiterated the standards by which an agency is to determine whether a final EIS is to be supplemented and by which a court is to review the agency's decision. "[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized." *Marsh,* 109 S.Ct. at 1859 (footnote omitted). "To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time the decision is made." *Id.* (footnote omitted). The agency is thus required to apply a "rule of reason" in fulfilling its obligation to take a "hard look" at the environmental effects of its planned action. *Id.* Application of the rule "turns on the value of the new information to the still pending decisionmaking process." *Id.* A supplemental EIS must be prepared, for example, if there remains major federal action to occur and "if the new information is sufficient to show that the remaining action will 'affec(t) the quality of the human environment' in a significant manner or to a significant extent not already considered." *Id.* (quoting 42 U.S.C. § 4332(2)(C)).

▮ In the context of reviewing a decision not to supplement an EIS, a court should not automatically defer to an agency's express reliance on an interest in finality without carefully reviewing the record and satisfying itself that the agency has made a reasoned decision based on its evaluation of the significance, or lack thereof, of the new information. *Id.* at 1861. Nevertheless, the standard of review is a narrow one, inquiring whether the agency's decision not to supplement was "arbitrary and capricious." *Id.* at 1860 (adopting standard of 5 U.S.C. § 706(2)(A)).

▮ The standards are quite similar in considering the decision not to supplement and recirculate a draft EIS. The Fifth Circuit has observed that "[i]n the ideal

situation all information contained in the Final EIS should have been circulated in the Draft EIS; however, to require such perfection under NEPA fails to recognize the reality that new and better information may become available." *Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430, 442 (5th Cir. Unit B 1981). "[A]n administrative process can never come to an end if the process must begin again every time new information is available." *Id.* (citing *Vermont Yankee Nuclear Power Corp.,* 435 U.S. at 555, 98 S.Ct. at 1217; *ICC v. Jersey City,* 322 U.S. 503, 514, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420 (1944)). There is therefore no *per se* rule that including in a final EIS information that was not part of the draft EIS renders the final EIS insufficient. *See id.* (inclusion in final EIS but not in draft EIS "does not necessarily violate NEPA").

The court cannot say, based upon the summary judgment record, that the FHWA acted arbitrarily or capriciously by addressing the matter of the depressed roadway in the FEIS without recirculating or supplementing the draft EIS. Because there is no *per se* rule that requires recirculation or supplementation, the court must analyze the record to determine if the FHWA properly applied the rule of reason standard or instead acted arbitrarily or capriciously. At the summary judgment stage, the court must ascertain whether there is evidence that requires determination by trial that the FHWA acted in violation of NEPA.

The court finds no such fact issue in the present case. HAVEN relies upon Dr. Brandes' affidavit to raise a material fact question. The three-page Brandes document contains only ambiguous reasons that underlie his opinion that "there are real environmental consequences that should be discussed" in relation to constructing eight lanes of SH 190 below grade. He opines that "[s]ignificant volumes of water contaminated with motor vehicle pollutants will be concentrated at one or a small number of sites by the drainage effort." (Brandes Aff. at 2). But he merely "anticipate[s]" that disposal location options will be few. *Id.* He observes

inscrutably that the existence of limited disposal options "implies" alterations of present surface drainage patterns and "may imply" changes in water quality in the Trinity River tributaries at either end of the depressed roadway section.

Dr. Brandes also addresses the possibility of flooding unless the regulatory floodway depicted in the FEIS is modified to deter an impermissible rise in surface water level and velocity. The "number of environmental consequences" that he says will follow such a channel modification, however, are not expressly disclosed by his affidavit testimony.

The court finds no fact issue presented by Dr. Brandes' affidavit that requires a trial of the recirculation/supplementation issue. The affidavit evidence is plainly insufficient to call into question the FHWA's decision to address the depressed roadway in the FEIS in the manner it did. The court cannot say there is a fact question whether the agency acted arbitrarily or capriciously or ignored the applicable "rule of reason" standard.

## IV.

Plaintiffs are entitled to seek a declaratory judgment that the FEIS is sufficient and are entitled to judgment on the merits. No later than 30 days following the filing of this memorandum opinion and order the court will enter a final judgment. If Collin County has taken the action required, *see* *supra* note 12, the court will include Collin County as a party to the judgment; otherwise, judgment will be entered as to the remaining parties. Plaintiffs' request for contingent injunctive relief is denied without prejudice. HAVEN's motion for summary judgment is denied.

SO ORDERED.